

101 Eisenhower Parkway, Suite 412
Roseland, NJ 07068
(973) 287-0966

535 Fifth Avenue, 4th Floor
New York, NY 10017
(646) 374-0255

Eric H. Horn
Partner
O 973 287 5006
M 201 562 2095
ehorn@aystrauss.com

August 14, 2023

**VIA ECF AND EMAIL**

The Honorable Christine M. Gravelle
Clarkson S. Fisher US Courthouse
402 East State Street
Trenton, New Jersey 08608

> Re:   *In re Paxe Latitude LP*
> Bankruptcy Case No. 23-11337

Dear Judge Gravelle:

This firm is counsel to the above-referenced debtor and debtor in possession (the "***Debtor***"). Attached for the Court's consideration are the (i) DIP financing documents and (ii) proposed DIP Order. We look forward to presenting same for approval at tomorrow's hearing. Please have a member of Your Honor's staff contact the undersigned should there be any questions. Thank you.

Respectfully submitted,

*/s/ Eric H. Horn*

Eric H. Horn, Esq.

cc by E-mail and ECF:

Andrew Sherman, Esq.
Fred Stevens, Esq.





Scott Zuber, Esq
Maggie McGee, Esq.
Michael Handler, Esq. (email only)
Boris Mankovetskiy, Esq.
Michael Savetsky, Esq.

RELATIONSHIPS
First.

## **DIP Financing Documents**

*Executed Version*

August 14, 2023

<u>**CONFIDENTIAL**</u>
<u>**DELIVERED VIA ELECTRONIC COMMUNICATION**</u>

Paxe Latitude LP
c/o A.Y. Strauss LLC
101 Eisenhower Parkway, Suite 412
Roseland, New Jersey 07068
Attn: Eric H. Horn, Esq.
      Maria A.G. Harper, Esq.
Email: mharper@aystrauss.com
       ehorn@aystrauss.com

*Re:*    *Commitment Letter –DIP Facility for Paxe Latitude LP*

Ladies and Gentlemen:

You have advised undersigned investors (each, a "<u>Commitment Party</u>"; and, collectively, the "<u>Commitment Parties</u>") that Paxe Latitude LP (the "<u>Borrower</u>" or "<u>You</u>") is seeking to obtain $4.0 million of debtor-in-possession financing in the form of a superpriority junior lien senior secured single draw term loan credit facility (the "<u>DIP Facility</u>") in connection with the Borrower's ongoing case under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq*. (as amended, the "<u>Bankruptcy Code</u>") in the United States Bankruptcy Court for the District of New Jersey, case captioned 23-11337-CMG (the "<u>Chapter 11 Case</u>"). Capitalized terms used herein but not defined shall have the meanings assigned to them in the agreed final form of DIP Loan Agreement attached hereto as <u>Exhibit A</u> (the "<u>Proposed DIP Loan Agreement</u>"; together with this letter, the "<u>Commitment Letter</u>").[1] For the avoidance of doubt, this Commitment Letter amends and supersedes the Commitment Letter by and between the Commitment Parties and the Borrower, dated as of June 23, 2023, which was automatically terminated in accordance with its terms.

1.    <u>Commitments</u>

In connection with the Chapter 11 Case, the Commitment Parties are pleased to advise you of their commitment to provide the DIP Facility upon the terms set forth in this Commitment Letter and the Proposed DIP Loan Agreement and subject to the satisfaction of the "Conditions Precedent

---

[1] The Proposed DIP Loan Agreement is in agreed and final form; however, the Commitment Parties and Borrower acknowledge and agree that additional non-material changes may be made upon the consent of the non-requesting party (with consent not to be unreasonably withheld). To the extent any such changes are made, an updated copy of the DIP Loan Agreement will be filed on the docket. A copy of the proposed final Budget as referenced in the Proposed DIP Loan Agreement is attached hereto as <u>Exhibit B</u>.

1

to the Closing of the DIP Facility" and the "Conditions Precedent to Borrowing DIP Loans" set forth in the Proposed DIP Loan Agreement. Upon the satisfaction (or waiver) of such conditions, the funding of the DIP Facility shall occur. The rights and obligations of each of the Commitment Parties under this Commitment Letter shall be several and not joint.

2.     Information

You hereby represent and covenant that, (a) all information and data that has been or will be made available to the Commitment Parties by you or on behalf of you, concerning the Borrower, or the Chapter 11 Case (the "Information") which is made available in connection with the transactions contemplated hereby (as subsequently updated or corrected), is or will be, when furnished, to the best of your knowledge (i) correct in all material respects, and (ii) does not or will not, contain any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements contained therein not materially misleading in light of the circumstances under which such statements are made (after giving effect to all supplements and updates thereto from time to time) and (b) any projections (the "Projections") that have been made or will be made available to us by or on behalf of you after the date hereof in connection with the transactions contemplated hereby, in each case of (a) or (b), have been or will be prepared in good faith based upon assumptions believed by you to be reasonable at the time furnished. You agree, that, if at any time prior to the Closing Date, you become aware that any of the representations in the preceding sentence would be incorrect in any material respect, then you will supplement the Information or the Projections, as applicable, from time to time until the Closing Date so that the representation and warranties in the preceding sentence each remain correct in all material respects under those circumstances; *provided* that any such supplementation shall cure any such breach of such representations and warranties. The accuracy of the foregoing representations and warranties, whether or not cured, shall not be a condition to the obligations of the Commitment Parties. In connection with the transactions contemplated hereby, the Commitment Parties and the DIP Agent will be entitled to use and rely primarily on the Information and the Projections without responsibility for independent verification thereof.

3.     Fees

As consideration for the commitments and agreements of the Commitment Parties hereunder, you agree to pay or cause to be paid the compensation described in this Commitment Letter and in the Proposed DIP Loan Agreement on the terms and subject to the conditions expressly set forth herein or therein, including, without limitation:

- A commitment fee equal to 5.00% *per annum* (the "Commitment Fee") on the entire DIP Commitments payable in cash, which shall be earned upon entry of the DIP Order and paid upon the earlier of the Closing Date or the Commitment Expiration Date (as defined herein);

- From and after entry of the DIP Order, a non-refundable unused ticking fee equal to 3.00% per annum (the "Ticking Fee") on the undrawn portion of the DIP Commitments, which shall be earned when such interest accrues and shall be paid

monthly in arrears and, to the extent accrued and unpaid, on the earlier of the (i) Commitment Expiration Date and (ii) the DIP Termination Date;

- An exit fee equal to 3.00% per annum (the "Exit Fee") on the entire DIP Commitments payable in cash, which shall be earned on the Closing Date and paid on the DIP Termination Date; provided that the Exit Fee shall be equal to 5.00% if the DIP Termination Date occurs prior to the initial Stated Maturity Date; and

- A fee equal 1.0% of the outstanding balance of the DIP Obligations outstanding as of the Stated Maturity Date or the Extended Stated Maturity Date being further extended (as applicable) paid in cash in arrears on the first business day following the Stated Maturity Date or the Extended Stated Maturity Date being further extended.

4.    Conditions

Notwithstanding anything in this Commitment Letter, the DIP Loan Documents or any other letter agreement or other undertaking concerning the financing of the transactions contemplated hereby to the contrary, the commitments of the Commitment Parties hereunder are subject to the "Conditions Precedent to the Closing of the DIP Facility" and "Conditions Precedent to Borrowing DIP Loans" set forth in the Proposed DIP Loan Agreement, which conditions shall be the only conditions (express or implied) to the availability of the DIP Facility on the Closing Date.

5.    Indemnification and Expenses

You agree (a) to indemnify and hold harmless each Commitment Party, the DIP Agent and each of their respective affiliates, controlling persons, directors, officers, managers, members, employees, partners, advisors, attorneys, agents and other representatives and the successors of each of the foregoing and their respective successors (each, an "Indemnified Party") from and against any and all losses, claims, damages, liabilities (including, fees and disbursements of counsel and reasonable out of pocket expenses, joint or several, to which any such Indemnified Party may become subject arising out of, resulting from, or in connection with this Commitment Letter (including the Proposed DIP Loan Agreement) or any claim, litigation, investigation or proceeding (a "Proceeding") relating to any of the foregoing, regardless of whether any Indemnified Party is a party hereto or thereto, whether or not such Proceedings are brought by you or your equity holders, affiliates, creditors or any other person, and to reimburse each Indemnified Party within thirty (30) days of written demand for any reasonable out-of-pocket legal fees and expenses of counsel (limited as set forth below) or other reasonable out of pocket fees and expenses incurred in connection with investigating, responding to, or defending any of the foregoing (but limited, in the case of legal fees and expenses, to one counsel to such Indemnified Party taken as a whole and, in the case of a conflict of interest, one additional counsel to the affected Indemnified Party taken as a whole, and, if reasonably necessary, one local counsel to such Indemnified Party in each applicable jurisdiction, in each case, excluding allocated costs of in-house counsel); provided that, the foregoing indemnity will not, as to any Indemnified Party, apply to losses, claims, damages, liabilities or related expenses to the extent they arise from (i) the willful misconduct, bad faith or

3

material breach of this Commitment Letter or gross negligence of such Indemnified Party as determined in a final non-appealable judgment of a court of competent jurisdiction or (ii) any disputes solely among the Indemnified Parties, other than claims arising out of any act or omission of the Borrower or its affiliated Debtor or any of your subsidiaries or affiliates, and (b) to reimburse the Commitment Parties and the DIP Agent for all reasonable out-of-pocket expenses (including, but not limited to, due diligence, investigation, consultants' fees, structuring, transportation, duplication, messenger and travel expenses, reasonable attorney's fees and costs and other reasonable fees and expenses, including the fees and expenses of King & Spalding LLP, counsel to Commitment Parties and DIP Agent (or any successor counsel to the DIP Agent and Commitment Parties) and one local counsel to the DIP Agent and the Commitment Parties), incurred by the Commitment Parties and the DIP Agent in connection with this Commitment Letter, the DIP Facility and any related documentation (including the DIP Loan Documents) or the administration, amendment, modification or waiver of any of the foregoing) immediately upon entry of the DIP Order and the effectiveness of this Commitment Letter (other than with respect to such fees and expenses invoiced on or after the Closing Date, which shall be paid in accordance with the DIP Credit Agreement as set forth in the Proposed DIP Loan Agreement). No Indemnified Party shall be liable for any damages arising from the use by others of Information or other materials obtained through electronic, telecommunications or other information transmission systems, including, without limitation, SyndTrak, IntraLinks, the internet, email or similar electronic transmission systems, in each case, except to the extent any such damages are found in a final non-appealable judgment of a court of competent jurisdiction to have resulted from the gross negligence or willful misconduct of such person.

You shall not be liable for any settlement of any Proceeding (or expenses related thereto) effected without your consent (which consent shall not be unreasonably withheld, conditioned or delayed), but if settled with your written consent and the approval of the Bankruptcy Court, or if there is a final and non-appealable judgment against an Indemnified Party in any such Proceeding, you agree to indemnify and hold harmless each such Indemnified Party to the extent and in the manner set forth above. You shall not, without the prior written consent of the requisite Indemnified Party (which consent shall not be unreasonably withheld, conditioned or delayed), effect any settlement of any pending or threatened Proceeding against such Indemnified Party in respect of which indemnity could have been sought hereunder by such Indemnified Party unless any such settlement is approved by the Bankruptcy Court and (a) such settlement includes a full and unconditional release of such Indemnified Party in form and substance satisfactory to such Indemnified Party from all liability or claims that are the subject matter of such Proceeding, (b) such settlement does not include any statement as to any admission of fault, culpability, wrongdoing or a failure to act by or on behalf of such Indemnified Party and (c) requires no action on the part of the Indemnified Party other than its consent (which consent shall not be unreasonably withheld, conditioned or delayed).

Notwithstanding anything to the contrary contained herein, upon the execution and effectiveness of the DIP Loan Documents, the relevant provisions of such definitive documentation shall supersede the provisions of the preceding paragraphs.

6.      Absence of Fiduciary Relationship, Affiliate Activities

You acknowledge and agree that (a) you are capable of evaluating and understanding, and you understand and accept, the terms, risks and conditions of the transactions contemplated by this Commitment Letter and the Proposed DIP Loan Agreement, (b) you have been advised that the Commitment Parties, the DIP Agent and their respective affiliates are engaged in a broad range of transactions that may involve interests that differ from your and your affiliates' interests and that none of any Commitment Party nor the DIP Agent has any obligation to disclose such interests and transactions to you, or your affiliates, (c) you have consulted your own legal, accounting, regulatory and tax advisors to the extent you have deemed appropriate and you are not relying on any Commitment Party or the DIP Agent for such advice and (d) none of any Commitment Party nor the DIP Agent nor their respective affiliates has any obligation to you or your affiliates with respect to the transactions contemplated hereby except those obligations expressly set forth herein or in any other express writing executed and delivered by any Commitment Party, the DIP Agent and you.

You further acknowledge and agree that (a) no fiduciary, advisory or agency relationship between you and us or the DIP Agent in its capacity as a Commitment Party is intended to be or has been created in respect of any of the transactions contemplated by this Commitment Letter, irrespective of whether any Commitment Party or the DIP Agent or their respective affiliates have advised or are advising you on other matters, (b) the Commitment Parties and the DIP Agent, in their capacities as such, on the one hand, and you, on the other hand, have an arms-length business relationship that does not directly or indirectly give rise to, nor do you rely on, any fiduciary duty on the part of any Commitment Party (and you hereby waive and release, to the fullest extent permitted by law, any claims that you may have against any Commitment Party and the DIP Agent and their respective affiliates with respect to any breach or alleged breach of fiduciary duty and agree that the Commitment Parties and the DIP Agent shall not have any liability (whether direct or indirect) to you in respect of such fiduciary duty claim or to any person asserting a fiduciary duty on behalf of or in right of you, including your employees or creditors, in each case in connection with the transactions contemplated hereby), (c) in connection therewith, the Commitment Parties and the DIP Agent, in their capacities as such, and their respective affiliates are each acting solely as a principal and not as agents or fiduciaries of you, (d) you are capable of evaluating and understanding, and you understand and accept, the terms, risks and conditions of the transactions contemplated by this Commitment Letter, (e) you have consulted legal and financial advisors to the extent you deemed appropriate and (f) you have been advised that the Commitment Parties, the DIP Agent and their respective affiliates are engaged in a broad range of transactions that may involve interests that differ from your interests and that they have no obligation to disclose such interests and transactions to you by virtue of any fiduciary, advisory or agency relationship.

7.      Confidentiality

This Commitment Letter is delivered to you on the understanding that neither this Commitment Letter nor any of its terms, or any information provided by any of the Commitment Parties in connection with the DIP Loan Documents, shall be disclosed to any other person, except (a) (i) actual and potential investors and your and their respective officers, directors, employees, affiliates, members, partners, stockholders, co-investors, attorneys, accountants, agents and

advisors, in each case, on a confidential and "need- to-know" basis, (b) as used for customary accounting purposes, pro forma information and a generic disclosure of aggregate sources and uses, in each case, on a confidential and "need-to- know" basis, (c) in any legal, regulatory, judicial or administrative proceeding or as otherwise required by applicable law, rule or regulation or as requested by a governmental authority, including, the Chapter 11 Case (in which case you agree, to the extent permitted by law, rule or regulation, to inform us promptly thereof), (d) in connection with the exercise of any remedy or enforcement of any right under this Commitment Letter, (e) to the extent any such information becomes publicly available other than by reason of disclosure by you, your subsidiaries or your representatives in violation of this Commitment Letter, (f) to the extent required by the Bankruptcy Court; and (g) with the consent of the Commitment Parties. Your obligations under this paragraph shall remain in effect until the date that is two years from the date hereof, regardless of whether the DIP Loan Documents shall have been executed and delivered by the parties hereto.

The Commitment Parties and the DIP Agent shall treat confidentially all nonpublic information received from you or your affiliates and representatives in connection with the DIP Facility and only use such information for the purposes of providing the services contemplated by this Commitment Letter; provided, however, that nothing herein shall prevent any Commitment Party or the DIP Agent from disclosing any such information (a) to any actual or potential DIP Lenders, current and potential investors and financing sources, co-investors, stockholders, participants, derivative counterparties, (b) in any legal, judicial, or administrative proceeding or other compulsory process or otherwise as required by applicable law, rule or regulations or as requested by a governmental authority, (c) upon the request or demand of any governmental or regulatory authority having jurisdiction over any Commitment Party or the DIP Agent or any of their affiliates, (d) to the officers, members, partners, directors, employees, legal counsel, independent auditors, professionals and other experts or agents of any Commitment Party or the DIP Agent (collectively, "Representatives") on a "need-to-know" basis and who are informed of the confidential nature of such information, (e) to any of their affiliates and Representatives of their affiliates (provided that, any such affiliate or Representative is advised of its obligation to retain such information as confidential and to use such information solely in connection with the DIP Facility and the related transactions), (f) to the extent any such information becomes publicly available other than by reason of disclosure by a Commitment Party, its affiliates or Representatives in breach of this Commitment Letter or other obligation of confidentiality owed to you or your affiliates, (g) for purposes of establishing a "due diligence" defense, (h) to the extent that such information is received by any Commitment Party or the DIP Agent from a third party that is not known by such person to be subject to confidentiality obligations to you or your affiliates, (i) to, as required or requested by, any self-regulatory authority, such as the National Association of Insurance Commissioners and (j) to enforce their respective rights hereunder; provided that, the disclosure of any such information to any actual or potential DIP Lenders, participants or derivative counterparties referred to above shall be made subject to the acknowledgment and acceptance by such actual or potential DIP Lender, participant or derivative counterparty that such information is being disseminated on a confidential and "need-to-know" basis (on substantially the terms set forth in this paragraph or as is otherwise reasonably acceptable to you and the applicable Commitment Party) in accordance with customary market standards for the dissemination of such types of information. The obligations of the Commitment Parties under this paragraph shall remain in effect until the earlier of (x) two years from the date hereof and (y) the

date the DIP Loan Documents are effective, at which time the obligations of the Commitment Parties and the DIP Agent under this paragraph shall automatically terminate and be superseded by the confidentiality provisions in the DIP Loan Documents upon the execution and delivery thereof.

8.    <u>Miscellaneous</u>

This Commitment Letter shall not be assignable by any party hereto without the prior written consent of the other parties hereto (and any purported assignment without such consent shall be null and void), and is intended to be solely for the benefit of the parties hereto and is not intended to and does not confer any benefits upon, or create any rights in favor of, any person other than the parties hereto. This Commitment Letter may not be amended or waived except by an instrument in writing signed by you, the Commitment Parties and the DIP Agent. This Commitment Letter may be executed in any number of counterparts, each of which shall be an original, and all of which, when taken together, shall constitute one agreement. Delivery of an executed counterpart of a signature page of this Commitment Letter by facsimile transmission or in "pdf" or similar format or any electronic signature complying with the U.S. federal ESIGN Act of 2000 or the New York Electronic Signature and Records Act or other transmission method shall be effective as delivery of a manually executed counterpart of this Commitment Letter. This Commitment Letter is the only agreement that has been entered into among us and you with respect to the DIP Facility and sets forth the entire understanding of the parties with respect thereto. This Commitment Letter shall be governed by, and construed and interpreted in accordance with, the laws of the State of New York without regard to principles of conflicts of law, to the extent that the same are not mandatorily applicable by statute and would require or permit the application of the law of another jurisdiction. Each of the parties hereto agrees that this Commitment Letter is a binding and enforceable agreement with respect to the subject matter herein, including an agreement to negotiate in good faith the DIP Loan Documents by the parties hereto in a manner consistent with this Commitment Letter and the Proposed DIP Loan Agreement and notwithstanding that the closing and funding of the DIP Facility is subject to certain conditions, including the execution and delivery of the DIP Loan Documents. Reasonably promptly following the execution of this Commitment Letter, the parties hereto shall proceed with the negotiation in good faith of the DIP Loan Documents for the purpose of executing and delivering the DIP Loan Documents. Section headings used herein are for convenience of reference only and are not to affect the construction of, or to be taken into consideration in interpreting, this Commitment Letter.

Each of the parties hereto irrevocably and unconditionally submits for itself and its property, to exclusive jurisdiction of the Bankruptcy Court. Each of the parties further agrees that a final and non- appealable judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. You and we agree that service of any process, summons, notice or document by registered mail addressed to any of the parties hereto at the applicable addresses above shall be effective service of process for any suit, action or proceeding brought in any such court. You and we hereby irrevocably and unconditionally waive, to the fullest extent you and we may legally and effectively do so, any objection to the laying of venue of any such suit, action or proceeding brought in any court in accordance with clause (a) of the first sentence of this paragraph and any claim that any such suit, action or proceeding has been brought in any inconvenient forum. YOU AND WE HEREBY  IRREVOCABLY  WAIVE  (TO  THE  FULLEST  EXTENT  PERMITTED  BY

APPLICABLE LAW) TRIAL BY JURY IN ANY SUIT, ACTION, PROCEEDING, CLAIM OR COUNTERCLAIM BROUGHT BY OR ON BEHALF OF ANY PARTY RELATED TO OR ARISING OUT OF THE DIP FACILITY CONTEMPLATED HEREUNDER, THIS COMMITMENT LETTER OR THE PERFORMANCE OF SERVICES HEREUNDER OR THEREUNDER.

The Commitment Parties hereby notify you that, pursuant to the requirements of the USA PATRIOT Act, Title III of Pub. L. 107-56 (signed into law on October 26, 2001) (as amended, the "PATRIOT Act"), they are required to obtain, verify and record information that identifies Borrower, which information includes names, addresses, tax identification numbers and other information that will allow the Commitment Parties to identify Borrower in accordance with the PATRIOT Act. This notice is given in accordance with the requirements of the PATRIOT Act and is effective for the Commitment Parties.

The fees, indemnification, expense reimbursement, absence of fiduciary duty, jurisdiction, waiver of jury trial, service of process, venue, governing law, and confidentiality provisions contained herein shall remain in full force and effect regardless of whether the DIP Loan Documents shall be executed and delivered and notwithstanding the termination of this Commitment Letter or the commitments hereunder; provided that, your obligations under this Commitment Letter shall automatically terminate and be superseded by the provisions of the DIP Loan Documents upon the execution and effectiveness thereof and you shall automatically be released from all liability in connection therewith at such time. You may terminate the commitments of the Commitment Parties hereunder at any time, subject to the provisions of the preceding sentence.

Please indicate your acceptance of the terms hereof by executing the Borrower's duly executed and authorized counterpart signature page by no later than 5:00 p.m., New York City time, on August 14, 2023 (the "Outside Commitment Date"). Kindly note that the Borrower's signature page will not be deemed duly executed and authorized unless the Bankruptcy Court has entered the DIP Order approving the Borrower's entry into this DIP Commitment Letter and authority to pay all fees payable hereunder. Unless the Commitment Parties shall, in their sole discretion, agree to an extension, this Commitment Letter and the commitments hereunder shall automatically terminate on the first to occur of (a) the Closing Date (upon which the commitments of the Commitment Parties hereunder shall automatically terminate and be superseded by the provisions of the DIP Loan Documents) and August 31, 2023 (such date, the "Commitment Expiration Date").

[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK]

We are pleased to have been given the opportunity to assist you in connection with this important financing.

Very truly yours,

THE COMMITMENT PARTIES

**CJL Greenwich, LLC**

*Eli Mermelstein*

_____
Name: Eli Mermelstein
Title: VP

Accepted and agreed to as of
the date first above written:

**THE BORROWER:**

PAXE LATITUDE LP

By:_____
Name:  David Goldwasser
Title:

EXHIBIT A

Proposed DIP Loan Agreement

[See Attached]

## AGREED FINAL FORM OF DIP LOAN AGREEMENT

$4,000,000.00                                                                                    August [__], 2023

**FOR VALUE RECEIVED**, and upon the terms and conditions set forth in this loan agreement (this "**Agreement**"), **PAXE LATITUDE LP**, a Delaware limited partnership, having its principal place of business at [_____] ("**Borrower**"), hereby promises to pay to the order of **CJI LLC**, a [Delaware] limited liability company(together with its successors and/or assigns, the "**DIP Lender**"), at [_____] or at any such other place as may be designated in writing by DIP Lender, the principal sum of [**FOUR MILLION AND 00/100 DOLLARS ($4,000,000.00)** (the "**DIP Loans**"; and the commitments in respect of the DIP Loans, the "**DIP Commitments**") plus interest on such DIP Loans at the Interest Rate, together with the fees, expenses and any other obligations set forth hereunder and under any of the other Loan Documents (as defined herein) (together with the DIP Loans, the "**DIP Obligations**"; and the DIP Lender's claim under the DIP Facility (as defined herein) in respect of its DIP Obligations of the Borrower, a "**DIP Claim**"; and collectively, the "**DIP Claims**"), in lawful money of the United States of America to be paid in accordance with the terms of this Loan Agreement (this "**Agreement**") and the Order (as defined herein).

1.   **DEFINED TERMS**

As used herein, the following terms shall have the following meanings specified below:

"**Affiliate**" shall mean, as to any particular Person, any Person directly or indirectly, through one or more intermediaries, controlling, Controlled by or under common Control with the Person or Persons in question.

"**Automatic Stay**" shall mean the automatic stay imposed under Section 362 of the Bankruptcy Code.

"**Bankruptcy Code**" shall mean Title 11 of the United States Code, 11 U.S.C. § 101, et seq., as the same may be amended from time to time, and any successor statute or statutes and all rules and regulations from time to time promulgated thereunder.

"**Budget**" shall mean the budget delivered in accordance with Section 4.4 and in form and substance acceptable to the DIP Lender.

"**Business Day**" shall mean any day of the week other than a Saturday, Sunday, federal holiday or holiday in the State of New York.

"**Change in Control**" shall have the meaning given to such term in Section 7.3 hereof.

"**Chapter 11 Case**" means the Borrower's ongoing case under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of New Jersey (the "**Bankruptcy Court**"), case captioned 23-11337-CMG.

"**Closing Date**" means the date of the satisfaction or waiver by the DIP Parties of the relevant "Conditions Precedent to the Closing of the DIP Facility" set forth below in Section 5.1 hereof.

"**Commitment Fee**" shall mean a fee equal to 5.00% *per annum* on the entire principal amount DIP Commitments payable in cash, which shall be earned upon entry of the Order and paid on the Closing Date.

"**Control**" shall mean the power to direct the management and policies of the applicable entity, directly or indirectly, whether through the ownership of a majority of voting rights or other beneficial interests, by contract or otherwise, provided that a direct or indirect limited investor in a particular Person that has customary, limited investor, major decision rights with respect to such particular Person shall not be deemed to Control such particular person solely as a result of having such major decision rights.  The terms "**Controlling**" and "**Controlled**" have meanings correlative thereto.

"**Debtor**" means the Borrower as the debtor in the Chapter 11 Case.

"**DIP Controlled Account**" shall have the meaning given to such term in Section 2.3 hereof.

"**DIP Agent**" means CJI LLC.

"**DIP Commitment Letter**" means that certain letter between Borrower and DIP Lender dated August 14, 2023.

"**DIP Facility**" means the Four Million and 00/100 Dollars ($4,000,000) term loan facility made by DIP Lender pursuant to the terms of this Agreement and the other Loan Documents.

"**DIP Liens**" shall have the meaning assigned to such term in the then applicable Order.

"**DIP Parties**" means the DIP Lender and DIP Agent, together.

"**DIP Proceeds**" shall mean the proceeds received by the Borrower from the DIP Loans.

"**DIP Termination Date**" means the date by which all outstanding DIP Obligations will be due and payable in full in cash unless otherwise agreed to by the DIP Agent and the Required DIP Parties, which shall be on the earliest of (i) the Stated Maturity Date, (ii) the consummation of any sale of all or substantially all of the assets of the Borrower pursuant to Section 363 of the Bankruptcy Code, (iii) the date on which the DIP Loans are accelerated pursuant to an Event of Default in accordance with the terms of this Agreement, (iv) the Plan Effective Date, and (v) within two (2) Business Days of the receipt by the Borrower of net proceeds from the Insurance Settlement (as defined below).

"**Dollars**" or "**$**" refers to the lawful money of the United States of America.

"**Environmental Law**" means all binding and applicable treaties, laws, rules having the force and effect of law, regulations, codes, ordinances, orders, decrees, judgments, injunctions or agreements issued, promulgated or entered into by or with any Governmental Authority, relating in any way to the protection of the environment, the preservation or reclamation of natural resources, the generation, management, release or threatened release of, or exposure to, any hazardous material or to workplace health and safety matters.

"**Environmental Liability**" means any liability, contingent or otherwise (including any liability for damages, costs of medical monitoring, costs of environmental remediation or restoration, administrative oversight costs, consultants' fees, fines, penalties or indemnities), resulting from or based upon (a) any violation of any Environmental Law or permit, license or approval issued thereunder, (b) the generation, use, handling, transportation, storage, treatment or disposal of any hazardous materials, (c) exposure to any hazardous materials, (d) the release or threatened release of any hazardous materials or (e) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"**Exit Fee**" shall mean a non-refundable fee equal to three 00/100 percent (3.00%) *per annum* on the entire DIP Commitments payable in cash, which shall be earned on the Closing Date and paid on the DIP Termination Date; provided that the Exit Fee shall be equal to five 00/100 (5.00%) if the DIP Termination Date occurs prior to the initial Stated Maturity Date.

"**Event of Default**" shall have the meaning given to such term in Section 5.1 hereof.

"**Extended Stated Maturity Date**" shall have the meaning given to such term in Section 2.1.(c) hereof.

"**Extension Fee**" shall mean a non-refundable fee equal to one 00/100 percent (1.0%) of the outstanding balance of the DIP Obligations outstanding as of the Stated Maturity Date or the Extended Stated Maturity Date being further extended (as applicable), which shall be paid-in-kind by capitalizing the fee to the outstanding principal balance of the DIP Obligations.

"**Governmental Authority**" shall mean any court, board, agency, commission, office or other authority of any nature whatsoever for any governmental unit (Federal, state, county, district, municipal, city or otherwise (but excluding foreign)) whether now or hereafter in existence.

"**Guarantees**" means each of the guaranty of Barry Drillman and Baruch Gottesman, together, pursuant to their respective Guaranty Agreements.

"**Guaranty Agreement**" means each guaranty agreement between the Borrower, the DIP Agent, the DIP Lender, and Barry Drillman and Baruch Gottesman, in form and substance acceptable to the DIP Parties.

"**Indemnified Party**" shall have the meaning given to such term in Section 13.2.

"**Indemnified Liabilities**" shall have the meaning given to such term in Section 13.2.

"**Insurance Settlement**" shall mean the payment pursuant to the Borrower's insurance policies from its insurer of net cash proceeds in an amount sufficient to pay the Lument Obligations and the DIP Obligations in cash, in full.

"**Interest Rate**" shall 18.00% per annum, calculated on the basis of the actual number of days elapsed in a 360-day year.

"**K&S**" is King & Spalding LLP, counsel to the DIP Parties.

"**Lease**" shall have the meaning given to such term in the Security Instrument.

"**Lien**" means, with respect to any asset, (a) any mortgage, deed of trust, lien, pledge, charge, assignment by way of security, hypothecation, security interest or similar encumbrance given in the nature of a security interest in, on or of such asset and (b) the interest of a vendor or a lessor under any conditional sale agreement, capital lease or title retention agreement (or any financing lease having substantially the same economic effect as any of the foregoing) relating to such asset.

"**Loan**" means the DIP Loans.

"**Loan Documents**" means this Agreement, the Guarantees, the Order, the Security Instrument, the DIP Commitment Letter and any other document executed in connection with the foregoing.

"**Lument Loan Agreement**" means that certain loan facility dated August 16, 2021, in an amount of up to $15,886,000 (plus all applicable interest, fees, costs and expenses payable under the governing loan and security documents and applicable law) with Lument Commercial Mortgage Trust ("**Lument**"), as a successor in interest to Lument Structured Finance, LLC (f/k/a OREC Structured Finance Co., LLC), as lender to finance the Borrower's acquisition of the real property located at 521, 525 and 529 Sawyer Boulevard, Columbus, Ohio 43203.

"**Lument Secured Parties**" shall have the meaning ascribed to such term in the Order.

"**Milestones**" shall have the meaning given to such term in Section 6.6 herein.

"**Material Adverse Effect**" means any event, circumstance or condition that materially adversely affects:  (i) the business, operations, properties or financial condition of Borrower, (ii) the legality, validity or enforceability of any Loan Documents or the Order, (iii) the rights and remedies of the DIP Parties, taken as a whole, under the Loan Documents, (iv) the perfection or priority of the DIP Liens granted pursuant to the Order and the other Loan Documents, or (v) the ability of the Borrower and/or the Guarantors, taken as a whole, to perform their payment obligations under any Loan Document to which the Borrower is a party.

"**Order**" shall mean the order, in form and substance acceptable to the DIP Agent and the DIP Lender, entered by the Bankruptcy Court in the Chapter 11 Case authorizing and approving, among other things, the DIP Facility and the transactions contemplated by this Agreement, together with any amendments or supplements to such order entered from time to time that are acceptable to the DIP Agent and the DIP Lender.

"**Permitted Variance**" shall mean the Borrower may exceed the aggregate monthly disbursements set forth in the Budget by ten percent (10%).

"**Person**" shall mean any individual, corporation, partnership, joint venture, limited liability company, estate, trust, unincorporated association, any Governmental Authority, and any fiduciary acting in such capacity on behalf of any of the foregoing.

"**Petition Date**" means February 20, 2023, the date on which the Chapter 11 Case was commenced in accordance with applicable law.

"**Plan Effective Date**" shall have the meaning given to such term in Section 6.4.(a).

"**Related Parties**" means, with respect to any specified Person, (a) such Person's Affiliates and Controlling Persons and (b) the respective partners, directors, officers, employees, trustees, agents, advisors and/or representatives of such Person and such Person's Affiliates and Controlling Persons (in the case of agents, advisors and/or representatives of such Person and such Person's Affiliates and Controlling Persons, acting at the instructions of such Person or such Person's Affiliates and Controlling Persons).

"**Required DIP Parties**" means, at any time, DIP Lender having Loans representing more than fifty percent (50%) of the aggregate outstanding Loans and DIP Obligations.

"**Security Instrument**" means that certain Junior Mortgage, Security Agreement, Assignment of Rents and Fixture Filing, of even date herewith, by Borrower for the benefit of DIP Lender, to be recorded in the official records of the Borrower.

"**Stated Maturity Date**" means December 31, 2023, as the same may be extended pursuant to Section 2.1.(c) hereof.

"**Stated Maturity Date Extension**" shall have the meaning given to such term in . hereof.

"**Taxes**" shall have the meaning given to such term in the Security Instrument.

"**Tenant Stipulation**" shall have the meaning given to such term in Section 5.1.(m).

"**Transfer**" shall have the meaning given to such term in Section 9 of the Security Instrument.

"**Ticking Fee**" means from and after entry of the Order, a non-refundable unused ticking fee equal to 3.00% *per annum* on the undrawn portion of the DIP Loans, which shall be earned when such interest accrues and shall be paid monthly in arrears and on the DIP Termination Date.

2.    **THE CREDITS**.

2.1.    Payment Terms.

2.1.(a)    Repayment of Loans.  Borrower hereby unconditionally promises to pay to the DIP Agent for the ratable account of the DIP Lender the then unpaid principal amount of, and unpaid accrued interest on, the DIP Loans made to Borrower, along with all other DIP Obligations owing under this Agreement and any other Loan Document, on the DIP Termination Date in cash without further application to or order of the Bankruptcy Court.

2.1.(b)    Payment of Interest.  The DIP Loans shall bear interest at the Interest Rate.  Borrower hereby unconditionally promises to pay to the DIP Agent for the ratable account of the DIP Lender (or, at the instruction of the DIP Agent, the DIP Lender directly) accrued interest in cash in arrears on the first business day of each month.

2.1.(c)    Extension Options.  Subject to the provisions of this Section 2.1.(c), notwithstanding anything to the contrary set forth herein, the Stated Maturity Date shall be automatically extended by the Borrower for one month (each monthly extension, a "**Stated Maturity Date Extension**"; and any such extended Stated Maturity Date pursuant to a Stated Maturity Date Extension, an "**Extended Stated Maturity Date**") in exchange for the Extension Fee; *provided*, *however*, there shall be no additional Stated Maturity Date Extension beyond the Stated Maturity Date Extension ending March 31, 2024.  The effectiveness of any Stated Maturity Date Extension shall be subject to satisfaction of the following conditions precedent:

(i)    At least one (1) Business Day prior to the Stated Maturity Date or subsequent Extended Stated Maturity Date, as applicable, Borrower shall have paid to DIP Lender the Extension Fee; and

(ii)    No Event of Default shall have occurred and be continuing under this Agreement or any of the other Loan Documents immediately prior to, or as of, the Extended Stated Maturity Date.

2.1.(d)    No Other Extensions of Maturity Date.  Except as expressly set forth in Section 2.1.(c), Borrower shall have no right or option to extend the Extended Stated Maturity Date after March 31, 2024, and the DIP Lender shall be under no obligation to consent to any further extension. Further, in the event the conditions set forth in Section 2.1.(c) are not satisfied, the DIP Lender shall have no obligation to extend the Stated Maturity Date or Extended Stated Maturity Date, as applicable.

2.2.  Pre-Payment.  Voluntary prepayment by the Borrower of the DIP Loans in full shall be permitted at any time, without premium or penalty.

2.3. Use of Proceeds.  The DIP Loans shall be used for the settlement payment under the Tenant Stipulation and other disbursements agreed to by the Borrower and the DIP Parties as set forth in the Budget.  The DIP Proceeds shall be funded into separate bank account subject to a control agreement in favor of the DIP Agent (the "**DIP Controlled Account**"), which shall be in place on the Closing Date. All DIP Proceeds not otherwise being applied to repay the obligations under the Lument Loan Agreement or DIP Loans shall be held in the DIP Controlled Account.

2.4. Disbursement of Loans.  Pending use in accordance with the Budget, all DIP Proceeds (including any intra-company transfers of such DIP Proceeds) shall be deposited into a DIP Controlled Account and invested at all times by the Borrower in cash.  Any such DIP Proceeds may only be used by Borrower in accordance with the Budget.

2.5. Request for Borrowing.  To request the disbursement of the DIP Loans, the Borrower shall notify DIP Agent and DIP Lender of such request in writing (including e-mail). Such request shall contain Borrower's bank information and such other information the DIP Agent (or its counsel, King & Spalding LLP) shall reasonably request.  For the avoidance of doubt, there shall only be one borrowing request for the full amount of the DIP Commitments permitted under this Agreement.

2.6. Fees.

2.6.(a)  Borrower agrees to pay DIP Lender the fees set forth in this Agreement at the times and in the amounts specified herein.

2.6.(b)  All fees shall be paid on the dates due, in Dollars, immediately available funds, to the DIP Agent for distribution to the DIP Lender (or, if there is only one DIP Lender on the Closing Date, to the DIP Lender directly).  Once paid, none of the fees shall be refundable under any circumstances.  The DIP Agent (on behalf of the DIP Lender) shall have the right to net any fees payable to the DIP Lender on the Closing Date from the disbursements of the DIP Loans.

2.6.(c)  Exit Fee.  Upon the repayment of the DIP Obligations in full, Borrower shall pay to DIP Lender the Exit Fee.  For the avoidance of doubt, the Exit Fee shall be paid (and added to the balance of DIP Obligations) in connection with the DIP Agent's exercise of remedies.

2.7. Super Priority Nature of Obligations and Lenders' DIP Liens.

2.7.(a)  The priority of the DIP Liens on the DIP Collateral shall be set forth in the Order.

2.7.(b)  All Obligations shall constitute Superpriority DIP Claims as set forth in the Order, subject to the priority set forth in the Order.

2.7.(c)  Except as set forth herein or in the Order, the Debtor shall not seek approval of any other claim having a priority superior or pari passu to that granted to the DIP Agent and DIP Lender by the Order while any DIP Obligations remain outstanding.

2.8. <u>Release</u>.  The Borrower hereby acknowledges effective upon entry of the Order, and subject to the terms thereof, that the Borrower shall have no defense, counterclaim, offset, recoupment, claim or demand of any kind or nature whatsoever that can be asserted to reduce or eliminate all of any part of the Borrower's liability to repay the DIP Agent or DIP Lender as provided in this Agreement or to seek affirmative relief or damages of any kind or nature from the DIP Parties.  Upon entry of the Order, the Borrower, each in its own right and on behalf of its bankruptcy estate, and on behalf of all their successors, assigns, subsidiaries and any Affiliates and any Person acting for and on behalf of, or claiming through them, hereby fully, finally and forever release and discharge the DIP Agent and the DIP Lender and all of the DIP Agent's and the DIP Lender's respective officers, directors, servants, agents, attorneys, assigns, heirs, parents, subsidiaries, and each Person acting for or on behalf of any of them of and from any and all actions, causes of action, demands, suits, claims, liabilities, Liens, lawsuits, adverse consequences, amounts paid in settlement, costs, damages, debts, deficiencies, diminution in value, disbursements, expenses, losses and other obligations of any kind or nature whatsoever, in each case, existing at the time of entry of the Order, whether in law, equity or otherwise (including, without limitation, those arising under Sections 541 through 550 of the Bankruptcy Code and interest or other carrying costs, penalties, legal, accounting and other professional costs, and incidental, consequential and punitive damages payable to third parties), directly or indirectly arising out of, connected with or relating to this Agreement, the Order and the transactions contemplated hereby, and all other agreements, certificates, instruments and other documents and statements (whether written or oral) related to any of the foregoing.  Notwithstanding anything herein to the contrary, the Borrower shall not have any obligation to indemnify or hold harmless the DIP Agent or DIP Lender hereunder with respect to liabilities to the extent they result from the actual fraud or willful misconduct of such DIP Agent or DIP Lender, as applicable, as finally determined by a court of competent jurisdiction.

2.9. <u>Grant of Security; Security for Obligations; Borrower Remains Liable</u>. Subject to the Order, Borrower hereby grants to the DIP Agent, for the benefit of itself and the DIP Lender, a security interest in all of such Borrower's right, title and interest in and to all of the following real and personal property, in each case whether now owned or existing or hereafter acquired, possessed or arising, whether tangible or intangible, wherever located, including any such property in which a security interest is granted to the DIP Agent pursuant to, as applicable, the Loan Documents, the Order, or any other order of the Bankruptcy Court to secure the DIP Obligations (all of which collectively shall hereinafter be referred to as the "**<u>DIP Collateral</u>**"): (i) second priority perfected junior liens on, and security interest in, all assets of the Borrower constituting collateral securing obligations under the Lument Loan Agreement; (ii) first priority perfected priority liens on, and security interest in, all assets of the Borrower not constituting collateral under the Lument Loan Agreement; and (iii) first priority perfected priority liens on, and security interest in, the DIP Controlled Account and the DIP Proceeds. The DIP Liens shall also be junior to any existing liens disclosed to the DIP Parties on Schedule 2.9 hereof.

3.  **<u>SECURITY INSTRUMENT /ADDITIONAL LOAN DOCUMENTS</u>**.  This Agreement (a) is secured by, among other agreements, the Security Instrument; and (b) is evidenced, secured and/or guaranteed pursuant to certain other instruments and agreements dated of even date herewith from Borrower and Guarantor to DIP Lender or between Borrower or Guarantor and DIP Lender (collectively said documents and agreements may be referred to herein as the "**<u>Loan Documents</u>**").  All of the terms, covenants, conditions and agreements contained in the Security Instrument are hereby incorporated herein and made a part hereof.  Notwithstanding anything to the contrary contained in any of the Loan Documents, Borrower acknowledges and agrees that although the Guaranty Agreements (the "**<u>Guarantees</u>**"), executed

by Barry Drillman**,** and Baruch Gottesman**,** (individually, a "**Guarantor**" and collectively, the "**Guarantors**"), the obligations and liabilities of Guarantor thereunder are not secured by the Security Instrument.

4.    **REPRESENTATIONS AND WARRANTIES.**

Borrower represents and warrants to the DIP Parties that:

4.1. Organization; Powers.  The Borrower is (a) duly organized or incorporated, validly existing and, to the extent such concept is applicable in the corresponding jurisdiction, in good standing under the laws of the jurisdiction of its organization or incorporation and (b) subject to the entry by the Bankruptcy Court of the applicable Order, has all requisite organizational or constitutional power and authority to (i) carry on its business as now conducted and as proposed to be conducted and (ii) to execute, deliver and perform its obligations under each Loan Document to which it is a party.

4.2. Authorization; Enforceability.  Subject to the entry by the Bankruptcy Court of the applicable Order, this Agreement (and the lending transactions contemplated hereby to occur on the Closing Date) has been duly authorized by all necessary corporate, shareholder or other organizational action by the Borrower and constitutes, and each other Loan Document to which Borrower is a party has been duly authorized by all necessary corporate, shareholder or other organizational action by Borrower.  This Agreement and each other Loan Document have been duly executed and delivered by Borrower that is a party thereto.  Subject to the entry by the Bankruptcy Court of the applicable Order, each Loan Document constitutes, or when executed and delivered by Borrower, will constitute, a legal, valid and binding obligation of Borrower (as the case may be), enforceable in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law.

4.3. Governmental Approvals; No Conflicts.  The execution, delivery and performance by the Borrower of the Loan Documents to which such Borrower is a party, the incurrence of debt hereunder and the granting of the Guarantees and security interests in respect thereof (a) do not require any material consent or approval of, registration or filing with, or any other action by, any Governmental Authority, except (i) such as have been obtained or made and are in full force and effect, in each case as of the Closing Date, (ii) filings and registrations of charges necessary to perfect the DIP Liens created under the Loan Documents and to release existing Liens (if any), (iii) stamping of any relevant Loan Documents, and (iv) the Order, (b) will not violate any Organizational Document of Borrower, (c) will not violate any law or regulation applicable to Borrower, (d) will not violate or result in a default under any agreement or other instrument in each case constituting debt binding upon Borrower or their respective assets, or give rise to a right thereunder to require any payment to be made by Borrower or give rise to a right of, or result in, termination, cancelation or acceleration of any obligation thereunder, in each case as of the Closing Date, and (e) will not result in the creation or imposition of any Lien on any asset of Borrower, except the DIP Liens created under the Loan Documents.

4.4. Financial Condition; Budget; No Material Adverse Effect.

4.4.(a)  The Borrower has heretofore furnished to the DIP Agent the Budget.  The Budget delivered thereafter is based on good faith estimates and assumptions believed by management of the Borrower to be reasonable and fair in light of current conditions and facts known to the Borrower at the time delivered.

4.4.(b)  Since the Petition Date other than those matters set forth in Schedule 4.6(a), no event, change or condition has occurred that has had, or would reasonably be expected to have, a Material Adverse Effect.

4.5. Properties; Intellectual Property.

4.5.(a)  Borrower has good title to, valid leasehold interests in, or rights to use, all its real and personal property material to its business, including the DIP Collateral, except for Liens known and disclosed to the DIP Parties.

4.6. Litigation and Environmental Matters.

4.6.(a)  Other than known causes of action including the Chapter 11 Case and related matters thereto, including those set forth on Schedule 4.6(a) hereto, there are no actions, suits, investigations or proceedings by or before any arbitrator or Governmental Authority pending against or, to the knowledge of Borrower, threatened in writing against Borrower as to which there is a reasonable possibility of an adverse determination and that, if adversely determined would reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect.

4.6.(b)  Except with respect to any other matters that, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect or any matters referenced, related to, or arising out of the actions commenced against the Debtor set forth on Schedule 4.6(a), Borrower (i) has not failed to comply with any Environmental Law or to obtain, maintain or comply with any permit, license or other approval required under any Environmental Law, (ii) has not become subject to any Environmental Liability or knows of any basis for which it would reasonably be expected for Borrower to become subject to any Environmental Liability nor (iii) has received written notice of any claim with respect to any Environmental Liability.

4.7. Compliance with Laws.  Except for those matters set forth in Schedules 4.6(a), subject to the entry of the Order, as applicable, Borrower is in compliance with all laws and regulations applicable to it or its property.

4.8. Taxes.  Other than the tax obligations set forth on Schedule 4.8 hereto, Borrower has timely filed or caused to be filed all Tax returns and reports required to have been filed by them and have paid or caused to be paid all Taxes required to have been paid by it (including in its capacity as a withholding agent), except any Taxes that are being contested in good faith by appropriate proceedings for which adequate reserves have been provided in accordance with GAAP or applicable foreign accounting principles or the payment of which are stayed by the Automatic Stay.

4.9. Disclosure.  As of the date of each Borrowing, the representations and warranties of the Borrower contained in or in any other documents, certificates or written statements furnished by or on behalf of Borrower to the DIP Agent and/or DIP Lender in connection with the transactions contemplated hereby (other than projections, budgets, forecasts, pro forma financial information and other forward-looking information and information of a general economic or general industry nature and other general market data), when taken as a whole, do not, as of the date furnished, contain any untrue statement of a material fact or omit to state any material fact (known to the Borrower, in the case of any document not furnished by any of them) necessary to make the statements therein not materially misleading in the light of the circumstances under which they were made (after giving effect to all supplements and updates thereto from time to time).

4.10.  Use of Proceeds.  The proceeds of the DIP Loans will be used in accordance with Section 2.3.

4.11.  Orders.  As of the date of the Borrowing, the Borrower is in compliance in all material respects with the terms and conditions of the Order.  The Order is in full force and effect, shall not have been reversed, vacated or stayed and shall not have been amended, supplemented or otherwise modified without the prior written consent of the DIP Agent acting at the direction of the Required DIP

Parties, and solely with respect to terms and provisions affecting the rights, protections, duties or obligations of the DIP Agent, the DIP Agent in its sole and absolute discretion, in each case, except for any such modification, stay, vacation, reversal, rescindment or amendment that is reversed within five (5) Business Days.

4.12.   No Default.  Borrower is not in default under any of the Loan Documents and no Event of Default exist and is continuing.

5.   **CONDITIONS**.

5.1. Closing Date. This Agreement and the obligations of the DIP Lender to make the DIP Loans on the Closing Date shall not become effective until the date on which each of the following express conditions are satisfied (or waived by the Required DIP Parties):

5.1.(a)  All documentation relating to the DIP Loans shall be in form and substance acceptable to the DIP Agent and the DIP Lender, and shall have been duly executed and delivered by all parties thereto.

5.1.(b)  DIP Agent (or its counsel) and the DIP Lender (or their counsel) shall have received: (A) from the Borrower, either (i) a counterpart of this Agreement signed on behalf of such party or (ii) written evidence reasonably satisfactory to the DIP Agent (which may include telecopy or other electronic transmission (including Adobe pdf file) of a signed signature page of this Agreement) that such party has signed a counterpart of this Agreement, (B) from the Borrower, executed counterparts of the Guaranty Agreements to be entered into on the Closing Date and (C) with respect to Borrower, UCC-1 financing statements in a form appropriate for filing in the state of organization of Borrower together with the results of customary UCC searches against the Borrower.

5.1.(c)  DIP Agent and the DIP Lender (or their counsel) shall have received: (i) a copy of each Organizational Document of the Borrower as of the Closing Date and, to the extent applicable, certified as of a recent date by the appropriate governmental official; (ii) signature and incumbency certificates of the officers of such Person executing the Loan Documents to which it is a party as of the Closing Date; (iii) resolutions of the board of directors or similar governing body of the Borrower approving and authorizing the execution, delivery and performance of this Agreement and the other Loan Documents to which Borrower is a party as of the Closing Date, certified as of the Closing Date by Borrower as being in full force and effect without modification or amendment; and (iv) a good standing certificate (to the extent such concept is known in the relevant jurisdiction) from the applicable Governmental Authority of the Borrower's respective jurisdiction of incorporation, organization or formation dated a recent date prior to the Closing Date.

5.1.(d)  The DIP Lender shall have received a Budget in form and substance satisfactory to the DIP Lender.

5.1.(e)  Other than the Order, there shall not exist any law, regulation, ruling, judgment, order, injunction or other restraint that prohibits, restricts or imposes a materially adverse condition on the DIP Facility or the exercise by the DIP Parties of their rights as secured parties with respect to the DIP Collateral.

5.1.(f)  All reasonable and documented (in summary form) out-of-pocket fees, costs, disbursements and expenses, accrued and unpaid as of the Closing Date, of (i) the DIP Agent

(limited, in the case of counsel, to all reasonable and documented out-of-pocket fees, costs, disbursements and expenses of the DIP Agent's outside counsel, K&S and any successor counsel, and, to the extent necessary, one firm of local counsel engaged by the DIP Agent in connection with the Debtor's Chapter 11 Case) and (ii) any other professional advisors retained by the DIP Agent at the direction of the Required DIP Parties in their reasonable discretion shall have been paid in full in cash (which payment may be made from DIP Proceeds), in each case to the extent invoices for any such accrued and unpaid amounts are provided to the Debtor no later than three (3) Business Days prior to the Closing Date. For the avoidance of doubt, any fees incurred by CJI LLC or any of its Affiliates, whether in its capacity as DIP Agent or DIP Lender, will be reimbursable pursuant to this Section 5.1.(f).

5.1.(g)  Other than the Order, there shall not exist any law, regulation, ruling, judgment, order, injunction or other restraint that prohibits, restricts or imposes a materially adverse condition on the DIP Facility or the exercise by the DIP Agent at the direction of the Required DIP Parties of its rights as a secured party with respect to the DIP Collateral.

5.1.(h)  Other than, in each case, as a result of the commencement and continuation of the Chapter 11 Case, the events leading up to the Chapter 11 Case, and the effect of the bankruptcy, since the commencement of the Chapter 11 Case, there shall have occurred no event, circumstance or condition which has resulted, or could reasonably be expected to result, in a material adverse change in (i) the business, operations, properties or condition (financial or otherwise) of the Borrower (ii) the legality, validity or enforceability of any Loan Documents or the Order, (iii) the ability of the Borrower to perform its payment obligations under the Loan Documents, (iv) the perfection or priority of the liens granted pursuant to the Loan Documents or the Order, or (v) the rights and remedies of the DIP Lender under the Loan Documents taken as a whole (any of the foregoing being a "**Material Adverse Change**").

5.1.(i)  Other than the Chapter 11 Case, as stayed upon the commencement of the Chapter 11 Case, or as disclosed to the DIP Lender, there shall exist no action, suit, investigation, litigation or proceeding pending or threatened in writing in any court or before any arbitrator or governmental authority that (i) would reasonably be expected to result in a Material Adverse Change or (ii) restrains, prevents or purports to affect materially adversely the legality, validity or enforceability of the DIP Loans or the consummation of the transactions contemplated thereby.

5.1.(j)  Other than as a result of or in connection with the Chapter 11 Case, all governmental and third-party consents and approvals reasonably necessary to be obtained by the Borrower in connection with the DIP Loans, if any, shall have been obtained (without the imposition of any conditions that are not reasonably acceptable to the DIP Lender) and shall remain in effect.

5.1.(k)  Subject to the entry of the Order, the DIP Lender shall have a valid and perfected lien on and security interest in the DIP Collateral of the Borrower on the basis and with the priority set forth herein.

5.1.(l)  The Bankruptcy Court shall have entered the Order on a final basis, in form and substance consistent with the terms and conditions set forth herein and otherwise satisfactory to the DIP Parties in its sole discretion, which Order shall include, without limitation, copies of this Agreement (in substantially final form) and the initial Budget as exhibits thereto, entered on notice to such parties as may be satisfactory to the DIP Parties and otherwise as required by the Bankruptcy Court and/or in accordance with the applicable provisions of the Bankruptcy Code, (i) authorizing and approving the Borrower's entry into the DIP Commitment Letter and the transactions contemplated thereby, (ii) authorizing and approving the DIP Facility and the transactions contemplated thereby,

including, without limitation, the granting of the superpriority status, security interests and liens, referred to herein; (iii) authorizing the lifting or modification of the automatic stay to permit the Borrower to perform its obligations, and the DIP Parties to exercise its rights and remedies, with respect to the DIP Facility; and (iv) reflecting such other terms and conditions that are mutually satisfactory to the DIP Parties and the Borrower, in their respective discretion, in each case, on the terms and conditions set forth herein; which Order shall be in full force and effect, shall not have been reversed, vacated or stayed and shall not have been amended, supplemented or otherwise modified without the prior written consent of the Required DIP Parties.

5.1.(m) The Bankruptcy Court shall have entered that certain *Stipulation and Agreed Order Between the Debtor, Legal Aid Society of Columbus, and the City of Columbus with Regard to Former Tenants of the Debtor's Real Property* (the "**Tenant Stipulation**"), which shall be in form and substance reasonably acceptable to the DIP Parties.

5.1.(n) The representations and warranties of Borrower set forth in <u>Section 4</u> and in each of the Loan Documents shall be true and correct in all material respects on and as of the Closing Date, except to the extent such representations and warranties expressly relate to an earlier date (in which case such representations and warranties shall be true and correct in all material respects on and as of such earlier date).

5.1.(o) Other than as a result of or in connection with the Chapter 11 Case, all governmental and third-party consents and approvals reasonably necessary to be obtained by the Borrower in connection with the DIP Facility, if any, shall have been obtained (without the imposition of any conditions that are not reasonably acceptable to the Required DIP Parties in their reasonable discretion) and shall remain in effect.

5.1.(p) There shall be no pending motion to dismiss the Chapter 11 Case or motion to lift the automatic stay filed by the Lument Secured Parties or any other creditor, and Lument Commercial Mortgage Trust's (I) Renewed Motion to Dismiss Debtor's Bankruptcy Case or, in the Alternative, for Relief from the Automatic Stay, and (II) Request for Adequate Protection [Doc. No. 121] shall have been overruled by the Bankruptcy Court.

5.2. <u>Borrowing</u>. Under this Agreement and the obligations of the DIP Lender to make the DIP Loans disbursements upon borrowing request of the Borrower, each of the following express conditions must be satisfied (or waived by the Required DIP Parties):

5.2.(a) No Default or Event of Default shall have occurred, and shall be continuing, under the Loan Documents immediately prior to the funding of the DIP Loans, or would result from such borrowing of the DIP Loans, if funded;

5.2.(b) The representations and warranties of the Borrower set forth in this Agreement shall be true and correct in all material respects (without duplication of any materiality qualifier) on and as of the proposed borrowing date, immediately after giving effect to the funding of the DIP Loans and to the application of the proceeds therefrom as though made on and as of such date (except to the extent such representations and warranties expressly relate to an earlier date, in which case such representations and warranties shall be true and correct in all material respects (without duplication of any materiality qualifier) as of such earlier date); and

5.2.(c) The making of the DIP Loans shall not violate any law or regulation

applicable to Borrower and shall not be enjoined temporarily, preliminarily or permanently.

6. **AFFIRMATIVE COVENANTS.**

From and after the Closing Date and until the DIP Obligations are paid in full in cash, the Borrower covenants and agrees with the DIP Parties that:

6.1. Insurance Matters. The Borrower shall (i) use best efforts to have the DIP Agent named as "Loss Payee" under the insurance policies with a position subordinate to Lument Secured Parties withing 30 days of the Closing Date and (ii) promptly deliver, upon receipt of same, to the DIP Parties copies of any correspondence from the Borrower's insurer (Great American Insurance Company) regarding coverage and payments related to the Borrower's property damage claims under applicable insurance policies;

6.2. Budget and Financial Reporting Obligations. Borrower shall deliver of the Budget, updated on a monthly basis and continue to adhere to the Budget; *provided that* Borrower may exceed the aggregate monthly disbursements within the Permitted Variance. Within five (5) Business Days of the end of the calendar month, the Borrower shall deliver a variance report to the DIP Parties that compares the actual disbursements made in the prior month against the disbursements set forth in the Budget on a line item and aggregate basis. [In addition to delivery of an updated Budget on a monthly basis, the Borrower shall be required to deliver customary financial information, including all information required to be delivered under the Lument Loan Agreement, and otherwise as mutually agreed to by the Borrower and the DIP Parties.

6.3. Compliance with Environmental Laws. Except where non-compliance would not reasonably be expected to result in a Material Adverse Effect, Borrower will: (a) comply in all material respects, with all Environmental Laws, including obtaining and complying with any permit, license or other approval required thereunder; and (b) conduct any investigation, study, sampling and testing, and undertake any cleanup, response or other corrective action required under any such Environmental Laws. For the avoidance of any doubt and notwithstanding anything to the contrary herein, the DIP Parties are aware of the existing environmental issues at the real property located at 521, 525 and 529 Sawyer Boulevard, Columbus, Ohio 43203 and the existence of such issues shall not constitute a default under DIP Facility.

6.4. Milestones. The Borrower covenants and agrees that so long as this Agreement remains in effect and until the DIP Obligations are paid in full cash, the Borrower shall ensure that each of the milestones (the "**Milestones**") set forth below is achieved in accordance with the applicable timing referred to below (or such later dates as may be approved in writing by the Required DIP Parties in their reasonable discretion):

6.4.(a)    No later than September 30, 2023, the Borrower shall have filed a disclosure statement (a "**Disclosure Statement**") and plan of reorganization (a "**Chapter 11 Plan**"), which shall provide for payment in full in cash of the DIP Obligations on the effective date of such Chapter 11 Plan (the "**Plan Effective Date**")  and otherwise be in form and substance satisfactory to the Required DIP Parties;

6.4.(b) No later than November 30, 2023, the Bankruptcy Court shall have entered an order, in form and substance satisfactory to the Required DIP Parties, approving the Disclosure Statement;

6.4.(c) No later than December 20, 2023, the Borrower shall have commenced solicitation on the Chapter 11 Plan to the extent necessary;

6.4.(d) No later than February 28, 2024, the Bankruptcy Court shall have entered an order, in form and substance reasonably satisfactory to the Required DIP Parties (and acceptable to the Required DIP Parties with respect to matters relevant to or affecting the DIP Parties), confirming the Chapter 11 Plan; and

6.4.(e) No later than March 31, 2024, the Plan Effective Date shall have occurred.

6.5. Chapter 11 Case.

6.5.(a)  Debtor shall deliver or cause to be delivered for review and comment, as soon as commercially reasonable and in any event at least two (2) Business Days (or as soon thereafter as is reasonably practicable under the circumstance) prior to filing, upon request, all material pleadings, motions and other documents (provided that any of the foregoing relating to the DIP Facility shall be deemed material) to be filed on behalf of the Debtor with the Bankruptcy Court to K&S and shall consult in good faith with such counsel regarding the form and substance of any such proposed filing.  If not otherwise provided by the Bankruptcy Court's electronic docketing system, the Borrower shall provide copies to the DIP Agent of all pleadings, motions, applications, judicial information, financial information and other documents filed by or on behalf of the Debtor with the Bankruptcy Court, filed with respect to the Chapter 11 Case or filed with respect to any Loan Document.  In connection with the Chapter 11 Case, the Debtor shall give the proper notice for (x) the motions seeking approval of the Loan Documents and the Order and (y) the hearing for the approval of the Order.

6.5.(b)  Borrower shall deliver or cause to be delivered to the DIP Agent and the DIP Lender, as soon as commercially reasonable upon receipt of same, copies of any term sheets, proposals, presentations or other material documents, from any Person, related to (i) the restructuring of the Debtor, or (ii) the sale of any material asset of the Debtor (for the avoidance of doubt, excluding ordinary course asset sales).

6.6. Budget.  The Borrower hereby acknowledges and agrees that any update to the Budget provided to the DIP Agent and the DIP Lender shall not amend and supplement the applicable approved Budget until the DIP Agent (at the direction of the Required DIP Parties) delivers a notice (which may be delivered by electronic mail) to the Borrower stating that the Required DIP Parties have approved of such updated Budget; provided, that if the DIP Agent does not deliver a notice of approval to the Borrower, then the existing approved Budget shall continue to constitute the applicable approved Budget until such time as the subject updated Budget is agreed to among the Borrower and the Required DIP Parties.  Once such updated Budget is so approved in writing by the DIP Agent and the Required DIP Parties, it shall supplement or replace the prior approved Budget, and shall thereafter constitute the approved Budget.

7.    **NEGATIVE COVENANTS.**

From and after the Closing Date and until the DIP Obligations are paid in full in cash, the Borrower covenants and agrees with the DIP Parties that:

7.1. Restrictions on Debts, Liens, Contracts, Organization Docs. Without the prior written consent of the DIP Agent and the Required DIP Parties, Borrower shall not incur or assume any additional debt or contingent obligations in respect of debt; give any guaranties in respect of debt, create any liens, charges or encumbrances or incur additional material contractual obligations; not merge or consolidate with any other person, change the nature of business or corporate structure, not amend its charter or by laws; not sell, lease or otherwise dispose of assets outside the ordinary course of business and beyond agreed upon

limits (if any); and not give a negative pledge on any assets in favor of any person other than the DIP Parties.

7.2. Payments on Other Obligations. Other than the DIP Obligations or the obligations under the Lument Loan Agreement, Borrower shall not prepay, redeem, purchase, defease, exchange or repurchase any debt or amend or modify any of the terms of any such debt or other similar agreements entered into by the Borrower.

7.3. Changes in Ownership. Borrower shall not permit any change in direct or indirect ownership or Control of the Borrower (a "**Change in Control**").

7.4. Changes to Order. Without the prior written consent of the DIP Agent and the Required DIP Parties, Borrower shall not make or permit to be made any change to the Order or any other order of the Bankruptcy Court with respect to the DIP Facility.

7.5. DIP Controlled Accounts.

7.5.(a)   Borrower shall not create, incur, assume or suffer to exist any Lien upon the DIP Controlled Account other than the DIP Lien created in favor of the DIP Agent and the DIP Lender under the Loan Documents.  For the avoidance of doubt, the DIP Controlled Account shall constitute DIP Collateral.

7.5.(b) Borrower shall not make or permit to be made any payment or withdrawal from a DIP Controlled Account except in accordance with the Budget, as expressly permitted in the Order, or the express terms of this Agreement.

7.6.  Chapter 11 Claims.   Except as provided in the Order, directly or indirectly, incur, create, assume, suffer to exist or permit any administrative expense claim or Lien that is pari passu with or senior to the claims or DIP Liens granted under the Loan Documents, as the case may be, of the DIP Agent and the DIP Lender against the Borrower hereunder or under the Order, or apply to the Bankruptcy Court for authority to do so.

7.7. Revision of Order; Applications to Bankruptcy Court; Superpriority Claims.   Directly or indirectly, (a) seek, support, consent to or suffer to exist any modification, stay, vacation or amendment of any Order or any other order of the Bankruptcy Court except for (i) any such modification, stay, vacation or amendment that is stayed or reversed with five (5) Business Days, (ii) modifications and amendments that do not affect the interests of the DIP Lender and (iii) any modifications and amendments agreed to in writing by the Required DIP Parties, in their sole discretion, (b) apply to the Bankruptcy Court for authority to take any action prohibited by the Section 7 (except to the extent such application and the taking of such action is conditioned upon receiving the written consent of the DIP Agent and the Required DIP Parties, in their sole discretion) or (c) seek authorization for, or permit the existence of, any claims other than that of the DIP Agent and the DIP Lender entitled to superpriority status under section 364(c)(1) of the Bankruptcy Code that is senior or pari passu with the DIP Agent and the DIP Lender's claim under section 364(c)(1) of the Bankruptcy Code other than as set forth in the Order.

7.8. Compliance with Budget. Except as otherwise provided herein or approved by the DIP Agent (at the direction of the Required DIP Parties, in their sole discretion), directly or indirectly, (a) use any cash, including the DIP Proceeds, in a manner or for a purpose other than those permitted under this Agreement, the Order or the Budget subject to Permitted Variances, (b) make any payment or application

for authority to make any payment, other than those permitted by this Agreement, the Order or the Budget, (c) permit the actual aggregate disbursements to exceed the aggregate amount of disbursements in the Budget by more than the Permitted Variance.

8. **DEFAULT AND ACCELERATION.**

8.1. Events of Default. If any of the following events shall occur (any such event,  an "**Event of Default**"):

8.1.(a)  Borrower shall fail to pay any principal of any Loan when and as the same shall become due and payable;

8.1.(b)  any Borrower shall fail to pay (x) any interest on any Loan, when and as the same shall become due and payable or (y) or any fee, charge, cost or expense payable hereunder or any other amount due under this Agreement or any other Loan Document (including any portion thereof that accrues after the commencement of any proceeding seeking liquidation, reorganization or other relief under any Federal, state or foreign bankruptcy, insolvency, receivership or similar law now or hereafter in effect, regardless of whether allowed or allowable in whole or in part as a claim in any such proceeding), when and as the same shall become due and payable;

8.1.(c)  any representation, warranty or certification, when taken as a whole, made or deemed made by Borrower in any Loan Document shall be false or incorrect in any material respect as of the date made or deemed made;

8.1.(d)  Borrower shall default in the performance or compliance of any term contained in any Loan Document (other than those specified in paragraph (a) or (b) of this Section 8.1), and default shall continue unremedied and unwaived for a period of ten (10) days after receipt by the Borrower of written notice thereof from DIP Agent (at the Required DIP Parties' direction) or the Required DIP Parties;

8.1.(e)  Other than with respect to the Chapter 11 Case, (i) an involuntary proceeding shall be commenced or an involuntary petition shall be filed seeking liquidation, reorganization or other relief in respect of Borrower or any other subsidiary, or of all or a substantial part of its assets, under any Federal, state or foreign bankruptcy, insolvency, receivership or similar law now or hereafter in effect or (ii) the involuntary appointment of a receiver, trustee, custodian, sequestrator, conservator, manager, administrative receiver or similar official Borrower or any other subsidiary or for a substantial part of its assets, and, in any such case, such proceeding shall continue undismissed and unstayed for forty five (45) consecutive days without having been dismissed, bonded or discharged or an order of relief is entered in any such proceeding;

8.1.(f)  Other than with respect to the Chapter 11 Case, Borrower shall (i) voluntarily commence any proceeding seeking liquidation, reorganization or other relief under any Federal, state or foreign bankruptcy, insolvency, receivership or similar law now or hereafter in effect, (ii) consent to the institution of any proceeding or petition described in paragraph (h) of this Section 8.1, (iii) consent to the appointment of a receiver, trustee, custodian, sequestrator, conservator, manager, administrative receiver or similar official for Borrower or for all or a substantial part of its assets or (iv) make a general assignment for the benefit of creditors;

8.1.(g)  any unsatisfied, final, non-appealable judgment(s) for the payment of

- 16 -

money in an aggregate amount in excess of $50,000 (to the extent not covered by insurance or indemnities as to which the applicable insurance company or third party has not denied coverage) shall be rendered against Borrower and the same shall remain undischarged, unvacated, unbounded and unstayed for a period of forty five (45) consecutive days;

8.1.(h)  (i) any of the Loan Documents shall cease for any reason to be in full force and effect, or Borrower shall so assert in writing, or (ii) any Lien purported to be created under any Security Document shall cease to be, or shall be asserted by Borrower not to be (other than in an informational notice to the DIP Agent), a valid and perfected (if and to the extent required to be perfected under the applicable Loan Document) Lien on a material portion of the DIP Collateral at any time, with the priority required by the applicable Security Document, except as a result of the release of Borrower or the sale, transfer or other disposition to a Person that is not the Borrower of the applicable DIP Collateral in a transaction permitted under the Loan Documents or the occurrence of the indefeasible payment in full in cash of the DIP Obligations;

8.1.(i)   a Change in Control shall have occurred;

8.1.(j)   any impairment of the Loan Documents shall have occurred;

8.1.(k)   the occurrence of any of the following concerning the Tenant Stipulation:

(1)  a breach of the Borrower's obligations under the Tenant Stipulation that is not promptly cured and provides any other party thereto the right to terminate the Tenant Stipulation or otherwise not support the Chapter 11 Plan; or

(2) the termination of the Tenant Stipulation due to any party's material breach thereunder.

8.1.(l)   the occurrence of any of the following in any Chapter 11 Case:

(1) filing of a plan of reorganization under Chapter 11 of the Bankruptcy Code by the Debtors (other than the Chapter 11 Plan) that has not been consented to by the Required DIP Parties;

(2) filing of a plan of reorganization by the Debtor (other than the Bankruptcy Plan) that does not propose to indefeasibly repay the DIP Obligations in full in cash, unless otherwise consented to by the DIP Agent and the Required DIP Parties;

(3) Debtor shall file a pleading seeking to vacate or modify the Order over the objection of the DIP Agent at the direction of the Required DIP Parties;

(4) entry of an order without the prior written consent of the Required DIP Parties amending, supplementing or otherwise modifying the Order;

(5) reversal, vacatur or stay of the effectiveness of the Order except to the extent stayed or reversed within five (5) Business Days;

(6)  a failure by the Borrower to comply with any material provision of the Order (except where such failure would not materially and adversely affect the DIP Agent or DIP Lender);

(7)  dismissal of the Chapter 11 Case or conversion of the Chapter 11 Case to a case under Chapter 7 of the Bankruptcy Code;

(8)  appointment of a Chapter 11 trustee or examiner with enlarged powers relating to the operation of the business of the Borrower;

(9)  any sale of all or substantially all assets of the Debtor pursuant to section 363 of the Bankruptcy Code, unless (i) the proceeds of such sale are applied to indefeasibly satisfy the DIP Obligations in full in cash in accordance with the priorities set forth in the Order or (ii) such sale is supported by the DIP Agent at the direction of the Required DIP Parties;

(10)    failure to meet a Milestone, unless extended or waived pursuant by the prior written consent of the DIP Agent at the direction of the Required DIP Parties;

(11)    granting of relief from the Automatic Stay in the Chapter 11 Case to permit foreclosure or enforcement on assets of the Borrower, in each case, with a fair market value in excess of $25,000;

(12)    the Debtor's filing of (or supporting another party in the filing of) a motion seeking entry of, or the entry of an order by the Bankruptcy Court, granting any superpriority claim or lien (except as contemplated herein) which is senior to or pari passu with the DIP Lender's claims under the DIP Facility;

(13)    the Debtor's filing of (or supporting another party in the filing of) a motion seeking entry of an order approving any key employee incentive plan, employee retention plan, or comparable plan, except as provided in the Chapter 11 Plan, without the prior written consent of the Required DIP Parties;

(14)    the Debtor shall seek, or shall support any other person's motion seeking (in any such case, verbally in any court of competent jurisdiction or by way of any motion or pleading with the Bankruptcy Court, or any other writing to another party in interest by Debtor) to challenge the extent, validity, perfection, priority, or enforceability of any of the DIP Liens;

(15)    payment of or granting adequate protection with respect to prepetition debt (including, for the avoidance of doubt, the Lument Obligations, other than as expressly provided in the Budget, herein or in the Order or consented to by the DIP Agent at the direction of the Required DIP Parties;

(16)    expiration or termination of the period provided by section 1121 of the Bankruptcy Code for the exclusive right to file a plan;

(17)    cessation of the DIP Liens or the Superpriority DIP Claims to be valid, perfected and enforceable in all respects;

(18)      Disbursements under the Budget are made at any time inconsistent with the Budget, subject to the Permitted Variance, without consent of or waiver by the DIP Agent at the direction of the Required DIP Parties;

(19)      any uninsured judgments are entered with respect to any post-petition non-ordinary course claims against the Debtor or any respective affiliates in a combined aggregate amount in excess of $25,000 unless stayed;

(20)      an order shall be entered in the Chapter 11 Case, without the prior written consent of the DIP Agent and the Required DIP Parties (i) to permit any administrative expense or any claim (now existing or hereafter arising of any kind or nature whatsoever) to have administrative priority equal or superior to the Superpriority DIP Claim or (ii) granting or permitted grant of a Lien that is equal in priority or senior to the DIP Liens other than as expressly set forth in the DIP Order;

(21)      other than the confirmation order confirming the Chapter 11 Plan, an order shall be entered by the Bankruptcy Court confirming a plan of reorganization or liquidation in the Chapter 11 Case which does not indefeasibly pay in full in cash the DIP Obligations upon the Plan Effective Date; or

(22)      the Borrower receives notice (a "Deficiency Notice") (which shall be delivered promptly to DIP Agent and DIP Lender) that it will not receive coverage under its insurance policies that will result in a payment, to be received prior to March 31, 2024, in an amount resulting in net cash proceeds in an amount equal to the Lument Obligations and the DIP Obligations; provided that the Borrower shall have thirty (30) calendar days to cure such Deficiency Notice if the Borrower is using commercially efforts to do so and in consultation with the DIP Agent and DIP Lender.

then, and in every such event, and at any time thereafter during the continuance of such event, the DIP Agent may, and at the request of the Required DIP Parties shall, by written notice to the Borrower, its counsel, the United States Trustee, and the Lument Secured Parties and their counsel, terminate the DIP Facility, declare the DIP Obligations in respect thereof to be immediately due and payable and exercise all rights and remedies under the Loan Documents and the Order.

8.2. <u>Remedies upon an Event of Default</u>.

8.2.(a)  If any Event of Default occurs and is continuing, then, subject to the terms of the Order, the automatic stay provisions of section 362 of the Bankruptcy Code shall be vacated and modified to the extent necessary to permit the DIP Agent, as applicable, and the Lenders to exercise all rights and remedies provided for in the Loan Documents and: (i) upon the occurrence and during the continuance of any Event of Default under the Loan Documents, to (A) cease making any DIP Loans under the DIP Facility to Borrower (to the extent the DIP Loans have not been disbursed) and (B) declare all DIP Obligations to be immediately due and payable;  and (ii) unless the Bankruptcy Court orders otherwise during such period, upon the occurrence of an Event of Default and the giving by the DIP Agent at the direction of the Required DIP Parties of five (5) Business Days prior written notice (the "**Termination Notice**"; and such notice period, the "**Remedies Notice Period**" provided that such period may be extended by written agreement by the Debtor and the DIP Agent (acting at the direction of the Required DIP Parties), in their respective discretion), delivered to counsel to the Debtor, with copies to the United States Trustee, to (A) immediately terminate the Debtor's use of any cash collateral, (B) freeze monies or balances in the Debtor's accounts (and, with respect to this Agreement and the DIP Facility, sweep all funds contained in the DIP Controlled Account); (C) set-off any and all amounts in accounts maintained by the Debtors with the DIP Agent or the Lenders against the DIP Obligations, or otherwise enforce any and all rights against the DIP Collateral in the possession of DIP Lender, including, without limitation, disposition of the DIP Collateral solely for application towards the DIP Obligations subject to the priorities set forth in Section 8.4 of this Agreement and the Order; and (D) take any other actions or exercise any other rights or remedies permitted under the Order, the Loan Documents or applicable law to effect the repayment of the DIP Obligations; provided, however, that the only basis on which the Debtor or any other party-in-interest shall have the right to contest a Termination Notice shall be with respect to the validity of the Event of Default giving rise to such Termination Notice (i.e., whether or not such Event of Default has occurred or not, or whether or not it has been cured within the cure periods expressly set forth in the applicable Loan Documents).  Subject to the preceding sentence, upon the occurrence and during the continuation of any Event of Default, the Borrower shall not be permitted to withdraw any funds from a DIP Controlled Account.  Upon and after the delivery of the Termination Notice, the Debtor and DIP Agent at the direction of the Required DIP Parties consent to a hearing on an expedited basis to consider whether the Automatic Stay may be lifted so that the DIP Agent, the DIP Lender and the Lument Secured Parties may exercise all of their respective rights and remedies in respect of the DIP Collateral in accordance with the Order and the Loan Documents, or to consider any other appropriate relief (including the Debtors' use of cash collateral on a nonconsensual basis).

8.2.(b)  Except as expressly provided above in this <u>Section 8.2</u>, to the maximum extent permitted by applicable law, presentment, demand, protest and all other notices of any kind are hereby expressly waived.

8.2.(c)  Borrower hereby waives any right to seek relief under the Bankruptcy Code, including under section 105 thereof, to the extent such relief would restrict or impair the rights and remedies of the DIP Agent and the DIP Lender set forth in the Order and in the Loan Documents.

8.3.    During the continuance of an Event of Default, DIP Lender may accept any payments from Borrower without prejudice to the rights and remedies of DIP Lender provided herein, in the Security Instrument or the Loan Documents or otherwise at law or in equity.

8.4. <u>Application of Proceeds</u>.  Upon the DIP Termination Date, all proceeds received by the DIP Agent in respect of any sale of, collection from, or other realization upon all or any part of the DIP Collateral under any Loan Document shall be applied by the DIP Agent as follows:

8.4.(a)  *First*, to payment of that portion of the DIP Obligations constituting fees, indemnities, expenses and other amounts (other than principal and interest) payable to DIP Agent in its capacity as such;

8.4.(b)  *Second*, to payment of that portion of the DIP Obligations constituting fees, indemnities and other amounts (other than principal and interest) payable to the DIP Lender, ratably among them in proportion to the amounts described in this Second clause;

8.4.(c)  *Third*, to payment of that portion of the DIP Obligations constituting accrued and unpaid interest ratably among the DIP Lender in proportion to the respective amounts described in this Third clause;

8.4.(d)  *Fourth*, to payment of that portion of the DIP Obligations constituting unpaid principal, ratably among the DIP Lender in proportion to the respective amounts described in this Fourth clause;

8.4.(e)  *Fifth*, to the payment of all other DIP Obligations of the Borrower that are due and payable to the DIP Agent and the DIP Lender on such date, ratably based upon the respective aggregate amounts of all such DIP Obligations owing to the DIP Agent and DIP Lender on such date; and

8.4.(f)  *Last*, the balance, if any, after all of the DIP Obligations have been paid in full, to the Borrower.

9.  **DEFAULT INTEREST/LATE CHARGES**.  Upon the occurrence of and during the continuance of any Event of Default, then, during the continuance of such Event of Default, under the Loan Documents, the DIP Loans and all DIP Obligations will automatically bear interest at an additional six 00/100 percent (6.00%) *per annum*, computed from said due date until the date such Event of Default is cured (the "**Default Rate**").  The Default Rate shall be computed from the date of the occurrence of the Event of Default until the earlier of the date upon which the Event of Default is cured or the date upon which the DIP Obligations are paid in full.  Interest calculated at the Default Rate shall be added to the DIP Obligations, and shall be deemed secured by the Security Instrument and the Loan Documents.  This clause, however, shall not be construed as an agreement or privilege to extend the date of the payment of the DIP Obligations nor as a waiver of any other right or remedy accruing to DIP Lender by reason of the occurrence of any Event of Default.

10.  **WAIVERS, AMENDMENTS.**  Subject to the terms of the Order, this Agreement or any other Loan Document, nor any provision hereof or thereof, may be waived, amended, or modified unless pursuant to an agreement in writing entered into by Borrower, the DIP Agent and the Required DIP Parties.

11.  **GOVERNING LAW; JURISDICTION; CONSENT TO SERVICE OF PROCESS**.

11.1.(a) This Agreement and the other Loan Documents and the rights and obligations of the parties hereunder and thereunder, including but not limited to the validity, interpretation, construction, breach, enforcement or termination hereof and thereof, and whether arising in contract or tort or otherwise, shall be construed in accordance with and governed by the law of the State of New York.

11.1.(b) Each of the parties hereto hereby irrevocably and unconditionally

submits, for itself and its property, to the exclusive jurisdiction of the Bankruptcy Court, and if the Bankruptcy Court does not have, or abstains from exercising jurisdiction, the Supreme Court of the State of New York sitting in New York County and of the United States District Court of the Southern District of New York ("SDNY"), and any appellate court from any thereof except to the extent that the provisions of the Bankruptcy Code are applicable and specifically conflict with the foregoing, in any action or proceeding arising out of or relating to any Loan Document, or for recognition or enforcement of any judgment, and each of the parties hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding shall be heard and determined in such Bankruptcy Court or New York State or, to the extent permitted by law, in the SDNY.  Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

11.1.(c) Each of the parties hereto hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection that it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to any Loan Document in any court referred to in paragraph (b) of this Section.  Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

11.1.(d) Each party to this Agreement irrevocably consents to service of process in the manner provided for notices in <u>Section 15</u>.  Nothing in any Loan Document will affect the right of any party to this Agreement to serve process in any other manner permitted by law. Notwithstanding any other provision of this <u>Section 15</u>, the Bankruptcy Court shall have exclusive jurisdiction over any action or dispute involving, relating to or arising out of this agreement or the other Loan Documents.

12. **<u>WAIVER OF JURY TRIAL.</u>  EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO ANY LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY).  EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.**

13. **<u>EXPENSES; INDEMNITY; DAMAGE WAIVER.</u>**

13.1.     Borrower shall pay promptly all (i) reasonable and documented (in summary form) out-of-pocket fees, costs, disbursements and expenses of the DIP Agent (including (and limited, in the case of counsel, to) all reasonable and documented out-of-pocket fees, costs, disbursements and expenses of the DIP Agent's outside counsel, K&S and, to the extent necessary, one firm of local counsel engaged by the DIP Agent in connection with the Chapter 11 Case, and any successor counsel to each), in the case of the foregoing clause, in connection with the negotiations, preparation, execution and delivery of the Loan Documents and the funding of all Loans under the DIP Loans, including, without limitation, all due diligence, transportation, computer, duplication, messenger, audit, insurance, appraisal, valuation and consultant costs and expenses, and all search, filing and recording fees, incurred or sustained by the DIP Agent, and their counsel and professional advisors in connection with the DIP Loans, the Loan Documents

or the transactions contemplated thereby, the administration of the DIP Facility and any amendment or waiver of any provision of the Loan Documents, and (ii) without duplication, reasonable and documented (in summary form) out-of-pocket fees, costs, disbursements and expenses of the DIP Agent (including (and limited, in the case of counsel, to) all reasonable and documented out-of-pocket fees, costs, disbursements and expenses of one firm of outside counsel for the DIP Agent and, to the extent necessary, one firm of local counsel engaged by the DIP Agent in each relevant jurisdiction, and any successor counsel to such primary counsel and local counsel) in connection with (A) the enforcement of any rights and remedies under the Loan Documents, (B) the Chapter 11 Case, including attendance at all hearings in respect of the Chapter 11 Case, and (C) defending and prosecuting any actions or proceedings arising out of or relating to the DIP Loans, the DIP Liens securing the DIP Loans, or any transaction related to or arising in connection with this Agreement or the other Loan Documents.

13.2.    Without duplication of the expense reimbursement obligations pursuant to <u>Section 11</u> above, the Borrower shall indemnify and hold harmless the DIP Parties and each of their Affiliates and each of the respective officers, directors, employees, controlling persons, agents, advisors, attorneys and representatives of each (each, an "**Indemnified Party**") from and against any and all claims, damages, actual losses, liabilities and expenses (including (and limited, in the case of counsel, to) reasonable and documented out-of-pocket fees and disbursements of (x) one counsel, one local counsel in each relevant jurisdiction, and any successor counsel to primary or local counsel, for the DIP Agent and (y) one counsel for the other Indemnified Parties), joint or several, that may be incurred by or asserted or awarded against any Indemnified Party, in each case arising out of or in connection with or relating to any investigation, litigation or proceeding or the preparation of any defense, arising out of or in connection with or relating to the DIP Loans, the Loan Documents or the transactions contemplated thereby, or any use made or proposed to be made with the DIP Proceeds, whether or not such investigation, litigation or proceeding is brought by any Debtor or any of its subsidiaries, any shareholders or creditors of the foregoing, an Indemnified Party or any other person, or an Indemnified Party is otherwise a party thereto (collectively, the "**Indemnified Liabilities**"), except, to the extent such claim, damage, loss, liability or expense (i) is found in a final non appealable judgment by a court of competent jurisdiction to have resulted solely from willful misconduct of such Indemnified Party or any of such Indemnified Party's affiliates or their respective principals, directors, officers or employees, (ii) resulted solely from a dispute among Indemnified Parties other than any claims against any Indemnified Party in its capacity or in fulfilling its role as the DIP Agent or (iii) other than in the case of the DIP Agent and its Related Parties, resulted from a material breach of the Loan Documents by such Indemnified Party or any of such Indemnified Party's Affiliates or their respective principals, directors, officers or employees, as determined in a final non-appealable judgment of a court of competent jurisdiction.   No Indemnified Party shall have any liability (whether direct or indirect, in contract, tort or otherwise) to the Borrower or any of its shareholders or creditors for or in connection with the transactions contemplated hereby, except, with respect to any Indemnified Party, to the extent such liability is found in a final non appealable judgment by a court of competent jurisdiction to have resulted (i) solely from willful misconduct of such Indemnified Party or any of such Indemnified Party's Affiliates or their respective principals, directors, officers or employees or (ii) other than in the case of the DIP Agent and its Related Parties, solely from a material breach of the Loan Documents by such Indemnified Person or any of such Indemnified Party's affiliates or their respective principals, directors, officers or employees.

13.3.    In case any proceeding is instituted involving any Indemnified Party for which indemnification is to be sought hereunder by such Indemnified Party, then such Indemnified Party will promptly notify the Borrower of the commencement of any proceeding; <u>provided</u>, <u>however</u>, that the failure to do so will not relieve the Borrower from any liability that they may have to such Indemnified Party hereunder, except to the extent that the Borrower is materially prejudiced by such failure.  Notwithstanding the above, following such notification, the Borrower may (except in the case of a case or proceeding brought against the DIP Agent or its Related Parties) elect in writing to assume the defense of such proceeding, and, upon such election, the Borrower will not be liable for any legal costs subsequently incurred by such

Indemnified Party (other than reasonable costs of investigation and providing evidence) in connection therewith, unless (i) the Borrower has failed to provide counsel reasonably satisfactory to such Indemnified Party in a timely manner, (ii) counsel provided by the Borrower reasonably determines its representation of such Indemnified Party would present it with an actual or perceived conflict of interest or (iii) the Indemnified Party reasonably determines that there are actual conflicts of interest between the Borrower and the Indemnified Party, including situations in which there may be legal defenses available to the Indemnified Party which are different from or in addition to those available to the Borrower.

14. **SUCCESSORS AND ASSIGNS.**  The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective registered successors and assigns permitted hereby, except that as otherwise permitted herein, the Borrower may not assign or otherwise transfer any of their rights or obligations hereunder without the prior written consent of the DIP agent and the Required DIP Parties.  Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, and, to the extent expressly contemplated hereby, the Related Parties of each of the DIP Agent and the DIP Lender) any legal or equitable right, remedy or claim under or by reason of this Agreement.

15. **NOTICES.**  Any notice, demand, statement, request or consent made hereunder shall be effective and valid only if in writing, referring to this Agreement or the other applicable Loan Documents, signed by the party giving such notice, and delivered either personally to such other party, or sent by nationally recognized overnight courier delivery service or by certified mail of the United States Postal Service, postage prepaid, return receipt requested, addressed to the other party as set forth below (or to such other address or person as either party or person entitled to notice may by notice to the other party specify):

<div style="margin-left:2em">

To DIP Lender:

CJI LLC
[_____]
Attention: Eli Mermelstein
Email: elim@cjillc.com


With a copy to:

King & Spalding LLP
1185 Avenue of the Americas 34th Floor
New York, NY  10036
Attention:  Michael Handler, Esq.
Email:  mhandler@kslaw.com

To Borrower:

Paxe Latitude LP
c/o A.Y. Strauss LLC
101 Eisenhower Parkway, Suite 412
Roseland, New Jersey 07068
Attn: Eric H. Horn, Esq.
     Maria A.G. Harper, Esq.
Email: mharper@aystrauss.com
          ehorn@aystrauss.com

</div>

Unless otherwise specified or as provided by law, notices shall be deemed given as follows: (i) if delivered personally, when delivered, (ii) if delivered by nationally recognized overnight courier delivery service, on the day following the day such material is sent, or (iii) if delivered by certified mail, on the third day after the same is deposited with the United States Postal Service as provided above.

16. **BANKRUPTCY MATTERS.** This Agreement, the other Loan Documents, and all Liens and DIP Liens and other rights and privileges created hereby or pursuant hereto or to any other Loan Document shall be binding upon the Debtor, the estate the Debtor, and any trustee, other estate representative or any successor in interest of any Debtor in the Chapter 11 Case or any subsequent case commenced under Chapter 7 of the Bankruptcy Code, and shall not be subject to Section 365 of the Bankruptcy Code. This Agreement and the other Loan Documents shall be binding upon, and inure to the benefit of, the successors of the DIP Parties and their respective assigns, transferees and endorsees. The DIP Liens created by this Agreement and the other Loan Documents shall be and remain valid and perfected in the event of the substantive consolidation or conversion of any Chapter 11 Case or any other bankruptcy case of any Debtor to a case under Chapter 7 of the Bankruptcy Code or in the event of dismissal of any Chapter 11 Case or the release of any DIP Collateral from the jurisdiction of the Bankruptcy Court for any reason, without the necessity that the DIP Agent file financing statements or otherwise perfect its DIP Liens under applicable law. Borrower may not assign, transfer, hypothecate or otherwise convey its rights, benefits, obligations or duties hereunder or under any of the other Loan Documents without the prior express written consent of the DIP Parties. Any such purported assignment, transfer, hypothecation or other conveyance by Borrower without the prior express written consent of the DIP Parties shall be void. The terms and provisions of this Agreement are for the purpose of defining the relative rights and obligations of Borrower, the DIP Parties with respect to the transactions contemplated hereby and no Person shall be a third party beneficiary of any of the terms and provisions of this Agreement or any of the other Loan Documents.

17. **MISCELLANEOUS**.

17.1.    TIME IS OF THE ESSENCE WITH RESPECT TO ALL PROVISIONS OF THIS AGREEMENT AND THE PAYMENT AND PERFORMANCE OF ALL OF THE OBLIGATIONS OF BORROWER HEREUNDER.

17.2.    If any payment to be made by Borrower shall otherwise become due on a day other than a Business Day, such payment shall be made on the first day prior thereto which is a Business Day.

17.3.    Borrower represents that it has full power, authority and legal right to execute and deliver this Agreement, and that this Agreement constitutes the valid and binding obligation of Borrower.

17.4.    Wherever pursuant to this Agreement it is provided that Borrower pay any costs and expenses, such costs and expenses shall include, without limitation, reasonable out-of-pocket legal fees and disbursements of DIP Lender with respect to retained firms. Borrower shall pay to DIP Lender, within ten (10) Business Days following receipt of written demand (together with documents reasonably substantiating such cost and expense demand provided that no information that is subject to attorney-client privilege shall be required), any and all actual, out-of-pocket expenses, including reasonable attorneys' fees, incurred or paid by DIP Lender in enforcing this Agreement.

17.5.    This Agreement cannot be changed, modified, amended, waived, extended, discharged or terminated orally or by estoppel or waiver, regardless of any claimed partial performance referable thereto, or by any alleged oral modification or by any act or failure to act on the part of Borrower

or DIP Lender.

       17.6.    Titles of articles and sections are for convenience only and in no way define, limit, amplify or describe the scope or intent of any provision hereof.

       17.7.    If any paragraph, clause or provision of this Agreement is construed or interpreted by a court of competent jurisdiction to be void, invalid or unenforceable, such voidness, invalidity or unenforceability will not affect the remaining paragraphs, clauses and provisions of this Agreement, which shall nevertheless be binding upon the parties hereto with the same effect as though the void or unenforceable part had been severed and deleted.

       17.8.    The terms and provision of this Agreement shall be binding upon and inure to the benefit of Borrower and DIP Lender and their respective successors and assigns, whether by voluntary action of the parties or by operation of law.

       17.9.    All the terms and words used in this Agreement, regardless of the number and gender in which they are used, shall be deemed and construed to include any other number, singular or plural, and any other gender, masculine, feminine, or neuter, as the context or sense of this Agreement or any paragraph or clause herein may require, the same as if such work had been fully and properly written in the correct number and gender.

       17.10.   Except as governed by the Bankruptcy Code, this Agreement shall be governed by and construed in accordance with the laws of the State of New York without regard to conflicts of laws principles.

       17.11.   <u>Oral Agreements Ineffective</u>.  THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS REPRESENT THE FINAL AGREEMENT AMONG THE PARTIES, AND THIS AGREEMENT MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS BETWEEN THE PARTIES.   THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.

**[REMAINDER OF PAGE LEFT INTENTIONALLY BLANK – SIGNATURE PAGE TO FOLLOW]**

**IN WITNESS WHEREOF,** the undersigned has executed the foregoing instrument as of the date first above written.

**BORROWER:**

**PAXE LATITUDE LP**

By: _____
          Name:
          Title:   Authorized Signatory

**DIIP AGENT AND DIP LENDER:**

**CJI LLC**

By:    _____
        Name:
        Title:    Authorized Signatory

**GUARANTOR:**

**BARRY DRILLMAN**

By: _____

      Name:

**GUARANTOR:**

**BARUCH GOTTESMAN**

By: _____

      Name:

Schedule 2.9

(Existing Liens)

1.  ABM Building Solution

2.  America's Floor Source LLC

3.  JF Granite LLC

4.  OREC Structured Finance Co., LLC (Lument)

5.  Pierce Carpet Cleaning

6.  TNT Landscaping LLC

<u>Schedule 4.6</u>

(Existing Litigation and Environmental Matters)

1.  *Lument Commercial Mortgage vs. Paxe Latitude LP* ; Case No. 22-cv-007387; Court of Common Pleas Franklin County

2.  *City of Columbus vs. Paxe Latitude, LP*; Case No. 2021-EVH-060061; Franklin County Municipal (Envtl Div)

3.  *State of Ohio, ex rel. Dave Yost Ohio Attorney General vs. Paxe Latitude LP, et al.*; Case No. 23-cv-003566

4.  *City of Columbus vs. Paxe Latitude, LP*; Case No. 2023-EVH-_____; Franklin County Municipal (Envtl Div)

Schedule 4.8

(Existing Tax Obligations)

1.   Real estate tax obligations

<u>Exhibit B</u>

Form of DIP Budget

[See attached]

**LATITUDE BUDGET**

**6-Month Budget**

| Month # | | 1 | 2 | 3 | 4 | 5 | 6 | TOTAL | |
|---|---|---|---|---|---|---|---|---|---|
| Month | Current | Jul-23 | Aug-23 | Sep-23 | Oct-23 | Nov-23 | Dec-23 | | |
| Tenant Settlement | 1,625,000 | - | - | - | - | - | - | $ | 1,625,000 |
| Asset Management Consulting (Ben | 15,000 | - | - | - | - | - | - | | 15,000 |
| Strategic Public Partners | - | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | - | | 125,000 |
| 1A Tactical Security | 31,014 | 31,014 | 31,014 | 31,014 | 31,014 | 31,014 | 31,014 | | 217,098 |
| Columbus Gas of Ohio (Reserve) | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | | 28,000 |
| City of Columbus (Water) | 1,200 | 1,200 | 1,200 | 1,200 | 1,200 | 1,200 | 1,200 | | 8,400 |
| AEP Ohio (Electric) | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | | 35,000 |
| Environmental | 106,000 | | | | | | | | 106,000 |
| Gable Elevator - Quarterly Service | 6,000 | - | - | 6,000 | - | - | - | | 12,000 |
| Gable Elevator - Repair | 7,500 | - | - | - | - | - | - | | 7,500 |
| Architectural Services - Due May | 6,000 | - | - | - | - | - | - | | 6,000 |
| COCG - Lawn Maintenance | 6,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | | 24,000 |
| COCG (Construction Management) | 55,000 | 12,500 | 12,500 | 12,500 | 12,500 | 12,500 | 12,500 | | 130,000 |
| ePro | 27,950 | - | - | - | - | - | - | | 27,950 |
| Breaker Checking | 21,354 | - | - | - | - | - | - | | 21,354 |
| Roofing | 21,350 | - | - | - | - | - | - | | 21,350 |
| G Mechanical (1 Tower) | 8,775 | - | - | - | - | - | - | | 8,775 |
| Spectrum | 300 | 300 | 300 | 300 | 300 | 300 | 300 | | 2,100 |
| Rumpke (Garbage) | 1,100 | 1,100 | 1,100 | 1,100 | 1,100 | 1,100 | 1,100 | | 7,700 |
| RE Taxes June 2023 | 254,638 | - | - | - | - | - | - | | 254,638 |
| GL Insurance | 4,700 | 4,700 | 4,700 | 4,700 | 4,700 | 4,700 | 4,700 | | 32,900 |
| Property Insurance | 128,000 | 27,381 | 27,381 | 27,381 | 27,381 | 27,381 | 27,381 | | 292,286 |
| Borrower Legal | 125,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | | 275,000 |
| US Trustee | 24,920 | 1,402 | 1,277 | 1,337 | 1,277 | 1,277 | 3,573 | | 35,063 |
| DIP Lender Legal | - | - | 200,000 | - | - | - | 25,000 | | 225,000 |
| DIP Interest | - | - | 22,000 | 58,000 | 60,000 | 60,000 | 60,000 | | 260,000 |
| DIP Fees [1] | - | - | 200,000 | - | - | - | 120,000 | | 320,000 |
| **Total** | $ 2,485,801 | $ 141,597 | $ 563,472 | $ 205,532 | $ 201,472 | $ 201,472 | $ 323,768 | $ | 4,123,114 |

(1) Includes the Commitment Fee (5.0% of $4M, $200,000) to be paid upon closing and the Exit Fee (3.0% of $4M, $120,000) to be paid upon termination.

**DIP Assumptions**

| | |
|---|---|
| Funding Amount | $  4,000,000.00 |
| Closing Date | 8/15/23 |
| Interest per Annum | 18.0% |
| Commitment Fee | 5.0% |
| Exit Fee | 3.0% |

## LATITUDE BUDGET

**6-Month Budget**

| Month # | Current | 1 | 2 | 3 | 4 | 5 | 6 | TOTAL |
|---|---|---|---|---|---|---|---|---|
| Month | | Jul-23 | Aug-23 | Sep-23 | Oct-23 | Nov-23 | Dec-23 | |
| Tenant Settlement | 1,625,000 | - | - | - | - | - | - | $ 1,625,000 |
| Asset Management Consulting (Ben | 15,000 | | | | | | | 15,000 |
| Strategic Public Partners | - | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | | 125,000 |
| 1A Tactical Security | 31,014 | 31,014 | 31,014 | 31,014 | 31,014 | 31,014 | 31,014 | 217,098 |
| Columbus Gas of Ohio (Reserve) | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 28,000 |
| City of Columbus (Water) | 1,200 | 1,200 | 1,200 | 1,200 | 1,200 | 1,200 | 1,200 | 8,400 |
| AEP Ohio (Electric) | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 35,000 |
| Environmental | 106,000 | | | | | | | 106,000 |
| Gable Elevator - Quarterly Service | 6,000 | - | - | 6,000 | - | - | - | 12,000 |
| Gable Elevator - Repair | 7,500 | | - | - | - | - | - | 7,500 |
| Architectural Services - Due May | 6,000 | - | - | - | - | - | - | 6,000 |
| COCG - Lawn Maintenance | 6,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 24,000 |
| COCG (Construction Management) | 55,000 | 12,500 | 12,500 | 12,500 | 12,500 | 12,500 | 12,500 | 130,000 |
| ePro | 27,950 | - | - | - | - | - | - | 27,950 |
| Breaker Checking | 21,354 | | | | | | | 21,354 |
| Roofing | 21,350 | | - | - | - | - | - | 21,350 |
| G Mechanical (1 Tower) | 8,775 | - | - | - | - | - | - | 8,775 |
| Spectrum | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 2,100 |
| Rumpke (Garbage) | 1,100 | 1,100 | 1,100 | 1,100 | 1,100 | 1,100 | 1,100 | 7,700 |
| RE Taxes June 2023 | 254,638 | - | - | - | - | - | | 254,638 |
| GL Insurance | 4,700 | 4,700 | 4,700 | 4,700 | 4,700 | 4,700 | 4,700 | 32,900 |
| Property Insurance | 128,000 | 27,381 | 27,381 | 27,381 | 27,381 | 27,381 | 27,381 | 292,286 |
| Borrower Legal | 125,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 275,000 |
| US Trustee | 24,920 | 1,402 | 1,277 | 1,337 | 1,277 | 1,277 | 3,573 | 35,063 |
| DIP Lender Legal | - | - | 200,000 | | | | 25,000 | 225,000 |
| DIP Interest | - | - | 22,000 | 58,000 | 60,000 | 60,000 | 60,000 | 260,000 |
| DIP Fees [1] | - | - | 200,000 | - | - | - | 120,000 | 320,000 |
| **Total** | **$ 2,485,801** | **$ 141,597** | **$ 563,472** | **$ 205,532** | **$ 201,472** | **$ 201,472** | **$ 323,768** | **$ 4,123,114** |

(1) Includes the Commitment Fee (5.0% of $4M, $200,000) to be paid upon closing and the Exit Fee (3.0% of $4M, $120,000) to be paid upon termination.

### DIP Assumptions

| | |
|---|---|
| Funding Amount | $ 4,000,000.00 |
| Closing Date | 8/15/23 |
| Interest per Annum | 18.0% |
| Commitment Fee | 5.0% |
| Exit Fee | 3.0% |

**Proposed DIP Financing Order**

| | |
|---|---|
| **UNITED STATES BANKRUPTCY COURT DISTRICT OF NEW JERSEY** | |
| *Caption in Compliance with D.N.J. LBR 9004-2* | |
| **A.Y. STRAUSS LLC** Eric H. Horn, Esq. Heike M. Vogel, Esq. Jordan M. Engelhardt, Esq. Tel: (973) 287-0966 Fax: (973) 226-4104 *Counsel to the Debtor and Debtor-in-Possession* | |
| In re: Paxe Latitude LP, Debtor. | Chapter 11 Case No. 23-11337 (CMG) |

---

### ORDER (I) AUTHORIZING DEBTOR IN POSSESSION FINANCING PURSUANT TO 11 U.S.C. §§ 105(a), 362 AND 364(c) AND (d); (II) GRANTING LIENS AND SUPERPRIORITY ADMINISTRATIVE CLAIMS PURSUANT TO 11 U.S.C. § 364(c); (III) MODIFYING THE AUTOMATIC STAY; AND (IV) GRANTING RELATED RELIEF

The relief set forth on the following pages, numbered two (2) through and including eighteen (18), is hereby **ORDERED**

Page:    2
Debtors: Paxe Latitude LP
Case No: 23-11337 (CMG)
Caption: Order (i) Authorizing Debtor in Possession Financing Pursuant to 11 U.S.C. §§ 105(a), 362 and 364(c) and (d); (II); Granting Liens And Superpriority Administrative Claims Pursuant to 11 U.S.C. § 364(c); (iii) Modifying the Automatic Stay; and (iv) Granting Related Relief

---

Upon the emergency motion, dated June 25, 2023 [D.I. 142] (the "***DIP Motion***")[1] of Paxe Latitude LP, the debtor and debtor in possession (the "***Debtor***" or "***DIP Borrower***") in the above-captioned chapter 11 case (the "***Case***"), seeking entry of an order (the "***Order***") pursuant to sections 105, 361, 362, 364, 506, 507 and 552 of chapter 11 of title 11 of the United States Code (the "***Bankruptcy Code***"), Rules 2002, 4001, 6003, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "***Bankruptcy Rules***"), and Rule 4001-3 of the Local Rules for the United States Bankruptcy Court for the District of New Jersey (the "***Local Rules***"), *inter alia:*

(i)        authorizing, on a final basis, the Debtor to obtain junior secured, postpetition financing on a superpriority basis consisting of a junior secured superpriority credit facility in the aggregate principal amount of $4,000,000 (the "***DIP Facility***"; and the loans disbursed thereunder, the "***DIP Loan Proceeds***") pursuant to the terms and conditions of that certain *Junior Secured and Superpriority Debtor-In-Possession Credit Agreement* attached as Exhibit A to that certain DIP Financing Commitment Letter, dated August 14, 2023, filed at Docket No. [__] (the "***Commitment Letter***")[2] by and among the DIP Borrower, as borrower, and CJI LLC and/or one or more of its affiliates, as lender, (collectively, the "***DIP Lenders***"), and CJI LLC as administrative agent (in such capacity, the "***DIP Administrative Agent***") for and on behalf of itself and the other lenders party thereto (collectively with the DIP Administrative Agent, the DIP Lenders, the "***DIP Secured Parties***");

---

[1] Capitalized terms not otherwise defined herein shall have the meaning ascribed to such terms in the DIP Motion.

[2] The Commitment Letter supersedes and replaces in its entirety the prior commitment letter provided by the DIP Lenders and DIP Administrative Agent dated June 23, 2023, which expired in accordance with its terms.

Page:      3
Debtors:   Paxe Latitude LP
Case No:   23-11337 (CMG)
Caption:   Order (i) Authorizing Debtor in Possession Financing Pursuant to 11 U.S.C. §§ 105(a),
           362 and 364(c) and (d); (II); Granting Liens And Superpriority Administrative Claims
           Pursuant to 11 U.S.C. § 364(c); (iii) Modifying the Automatic Stay; and (iv) Granting
           Related Relief

---

(ii)      approving the terms and authorizing the Debtor to execute and deliver the DIP Loan

Agreement and any other agreements and documents related thereto (together with the DIP Loan

Agreement, the "***DIP Loan Documents***") and to perform such other acts as may be necessary or

desirable in connection with the DIP Loan Documents and this Order;

(iii)     authorizing borrowings under the DIP Facility;

(iv)      granting to the DIP Administrative Agent and the DIP Lenders, on account of the

DIP Facility owing under the DIP Loan Documents (the "***DIP Obligations***") allowed superpriority

administrative expense claim status with respect to the DIP Obligations;

(v)       granting to the DIP Administrative Agent, for the benefit of itself and the DIP

Lenders, as security for the DIP Obligations, automatically perfected security interests in and liens

on all of the collateral securing the DIP Facility (collectively, the "***DIP Collateral***");

(vi)      authorizing the use of the proceeds of the DIP Facility to, among other things, make

payments in respect to administrative expenses (including budgeted professional fees) and other

disbursements (including the Tenant Settlement) (as defined in the DIP Motion) in accordance

with the Approved Budget (defined below), subject to the variances permitted in the DIP Loan

Agreement, all subject to the conditions set forth in the DIP Loan Documents and in this Order;

(vii)     vacating and modifying the automatic stay imposed by section 362 of the

Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of

the DIP Loan Documents and this Order.

Page:     4
Debtors:  Paxe Latitude LP
Case No:  23-11337 (CMG)
Caption:  Order (i) Authorizing Debtor in Possession Financing Pursuant to 11 U.S.C. §§ 105(a), 362 and 364(c) and (d); (II); Granting Liens And Superpriority Administrative Claims Pursuant to 11 U.S.C. § 364(c); (iii) Modifying the Automatic Stay; and (iv) Granting Related Relief

---

The Court having considered the DIP Motion, the exhibits attached thereto, the DIP Loan Documents, and the evidence submitted and argument made at the hearing held on August 15, 2023; and adequate and sufficient notice of such hearing having been given under the circumstances; and all objections, if any, to the relief requested in the DIP Motion having been withdrawn, resolved or overruled by the Court; and it appearing that approval of the relief requested in the DIP Motion is fair and reasonable and in the best interests of the Debtor and its estate, and is essential to the restructuring of the Debtor and the preservation of the value of the Debtor's assets; and it appearing that the Debtor's entry into the DIP Facility the DIP Loan Documents is a sound and prudent exercise of the Debtor's business judgment; and after due deliberation and consideration, and good and sufficient cause appearing therefor;

**THE COURT MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:**

A.    **Petition Date**. On February 20, 2023 (the "***Petition Date***"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the District of New Jersey (the "***Court***").

B.    **Debtor in Possession**. The Debtor has continued in the management and operation of its businesses and property as a debtor in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

C.    **Jurisdiction and Venue**. This Court has jurisdiction over the Case and this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Standing Order of Reference to the*

Page:    5
Debtors:  Paxe Latitude LP
Case No:  23-11337 (CMG)
Caption:  Order (i) Authorizing Debtor in Possession Financing Pursuant to 11 U.S.C. §§ 105(a), 362 and 364(c) and (d); (II); Granting Liens And Superpriority Administrative Claims Pursuant to 11 U.S.C. § 364(c); (iii) Modifying the Automatic Stay; and (iv) Granting Related Relief

---

*Bankruptcy Court Under Title 11* of the United States District Court for the District of New Jersey, dated September 18, 2012 (Simandle, C.J.). Venue for the Case and proceedings on the DIP Motion is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409 and this matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

D.    **Notice**. Notice of the DIP Motion and the hearing on the same are appropriate in light of the facts of this Case, and no other or further notice of the DIP Motion shall be required.

E.    **No Control**.  None of the DIP Administrative Agent or the DIP Lenders control the Debtor or its properties or operations, or is a control person or insider of the Debtor.

F.    **Findings Regarding Corporate Authority**. The Debtor has all requisite corporate or limited liability company authority to execute and deliver the DIP Loan Documents to which it is a party and to perform its obligations thereunder.

G.    **Findings Regarding Postpetition Financing.**

(i)    *Request for Postpetition Financing*. The Debtor seeks authority on a final basis to borrow under the DIP Facility on the terms described herein and in the DIP Loan Documents to fund the Tenant Settlement and to fund its administrative expense obligations in accordance with the Approved Budget.

(ii)    *Need for Postpetition Financing*. Without the funds provided for in the DIP Facility, the Debtor would be unable to fund the Tenant Settlement and fund its administrative obligations through the effective date of a plan of reorganization.

Page:      6
Debtors:  Paxe Latitude LP
Case No:  23-11337 (CMG)
Caption:  Order (i) Authorizing Debtor in Possession Financing Pursuant to 11 U.S.C. §§ 105(a),
          362 and 364(c) and (d); (II); Granting Liens And Superpriority Administrative Claims
          Pursuant to 11 U.S.C. § 364(c); (iii) Modifying the Automatic Stay; and (iv) Granting
          Related Relief

---

(iii)    *No Credit Available on More Favorable Terms*. Given its current financial condition, financing arrangements, and capital structure, the Debtor has been unable to obtain financing from sources other than the DIP Lenders on terms more favorable than the DIP Facility. The Debtor is unable to obtain unsecured credit allowable under Bankruptcy Code section 503(b)(1) as an administrative expense. The Debtor has also been unable to obtain (a) unsecured credit having priority over that of administrative expenses of the kind specified in sections 503(b), 507(a) and 507(b) of the Bankruptcy Code; (b) credit secured solely by a lien on property of the Debtor and its estate that is not otherwise subject to a lien; or (c) credit secured solely by a junior lien on property of the Debtor and its estate that is subject to a lien.

(iv)    *Use of proceeds of the DIP Facility*. As a condition to entry into and the extension of credit under the DIP Facility, the DIP Administrative Agent and the DIP Lenders required and continue to require, and the Debtor has agreed, that DIP Loan Proceeds shall be used, in each case in a manner consistent with the terms and conditions of this Order and the DIP Loan Documents and in accordance with the budget attached hereto as **Schedule 1** (as the same may be modified from time to time in accordance with the DIP Loan Documents and this Order), consistent with the terms of the DIP Loan Documents and subject to such variances as permitted therein (the "***Approved Budget***").  All DIP Loan Proceeds shall be held in a segregated bank account (the "***DIP Controlled Account***") subject to a control agreement in favor of the DIP Agent in accordance with the DIP Loan Documents.

H.    **Good Faith of the DIP Administrative Agent and DIP Lenders**.

Page:     7
Debtors:  Paxe Latitude LP
Case No:  23-11337 (CMG)
Caption:  Order (i) Authorizing Debtor in Possession Financing Pursuant to 11 U.S.C. §§ 105(a), 362 and 364(c) and (d); (II); Granting Liens And Superpriority Administrative Claims Pursuant to 11 U.S.C. § 364(c); (iii) Modifying the Automatic Stay; and (iv) Granting Related Relief

_____

(i)     _Willingness to Provide Financing_. The DIP Lenders have indicated a willingness to provide financing to the Debtor subject to: (a) entry of this Order; (b) approval of the terms and conditions of the DIP Facility and the DIP Loan Documents; (c) satisfaction of the closing conditions and conditions to the extension of credit set forth in the DIP Loan Documents; and (d) findings by this Court that the DIP Facility is essential to the Debtor's estate, that the DIP Administrative Agent and the DIP Lenders are extending credit to the Debtor pursuant to the DIP Loan Documents in good faith, and that the DIP Administrative Agent's and the DIP Lenders' claims, superpriority claims, security interests and liens and other protections granted pursuant to this Order and the DIP Loan Documents will have the protections provided by section 364(e) of the Bankruptcy Code.

(ii)    _Business Judgment and Good Faith Pursuant to Section 364(e)._ The terms and conditions of the DIP Facility and the DIP Loan Documents, and the interest and fees paid and to be paid thereunder, are fair, reasonable, and the best available to the Debtor under the circumstances, are ordinary and appropriate for secured financing to a debtor in possession, reflect the Debtor's exercise of prudent business judgment consistent with its fiduciary duties, and are supported by reasonably equivalent value and consideration. The terms and conditions of the DIP Facility were negotiated in good faith within the meaning of Section 364(e) of the Bankruptcy Code and at arms' length among the Debtor, the DIP Administrative Agent, and the DIP Lenders, with the assistance of their respective counsel.

Page:      8
Debtors:  Paxe Latitude LP
Case No:  23-11337 (CMG)
Caption:  Order (i) Authorizing Debtor in Possession Financing Pursuant to 11 U.S.C. §§ 105(a),
          362 and 364(c) and (d); (II); Granting Liens And Superpriority Administrative Claims
          Pursuant to 11 U.S.C. § 364(c); (iii) Modifying the Automatic Stay; and (iv) Granting
          Related Relief

---

Based upon the foregoing findings and conclusions and the record before the Court

with respect to the DIP Motion, and after due consideration and good and sufficient cause

appearing therefor,

**IT IS HEREBY ORDERED** that:

1.        **Financing Approved**. The DIP Motion is granted as set forth herein,

the funding provided under the DIP Facility, the DIP Commitment Letter, DIP Loan Documents

is authorized and approved.  All objections to the DIP Motion to the extent not withdrawn, waived,

settled, or resolved, and all reservations of rights included therein, are hereby denied and overruled.

## DIP Facility Authorization

2.        **Authorization of the DIP Facility**. The DIP Facility is hereby

approved. The Debtor is expressly and immediately authorized and directed to borrow under the

DIP Loan Documents and under the DIP Facility, and to incur and to perform the DIP Obligations

in accordance with, and subject to, the terms of this Order and the DIP Loan Documents, and to

execute and deliver all instruments, certificates, agreements, and documents which may be

required or necessary for the performance by the Debtor under the DIP Facility and the creation

and perfection of the liens described in and provided for by this Order.  Upon execution and

delivery, the DIP Loan Documents shall represent valid and binding obligations of the Debtor,

enforceable against the Debtor and its estate in accordance with their terms and this Order.  In the

event of any inconsistency between the terms of this Order and the DIP Loan Documents, the terms

of the Order shall control.

Page:     9
Debtors:  Paxe Latitude LP
Case No:  23-11337 (CMG)
Caption:  Order (i) Authorizing Debtor in Possession Financing Pursuant to 11 U.S.C. §§ 105(a), 362 and 364(c) and (d); (II); Granting Liens And Superpriority Administrative Claims Pursuant to 11 U.S.C. § 364(c); (iii) Modifying the Automatic Stay; and (iv) Granting Related Relief

---

3.        **Authorization to Borrow**. From the entry of this Order through and including the Maturity Date (defined below), and subject to the terms and conditions set forth in the DIP Loan Documents and this Order, the Debtor is hereby authorized to borrow $4,000,000.

4.        **DIP Obligations**. The DIP Loan Documents and this Order shall constitute and evidence the validity and binding effect of the Debtor's DIP Obligations, which DIP Loan Documents and this Order shall be enforceable against the Debtor, its estate and any successor thereto, including any trustee appointed in the Case, or in any case under chapter 7 of the Bankruptcy Code upon the conversion of any of the Case, or in any other proceedings superseding or related to any of the foregoing (collectively, the "*Successor Cases*"). No obligation, payment, transfer, or grant of collateral security hereunder or under the DIP Loan Documents shall be stayed, restrained, voidable, avoidable, or recoverable, under the Bankruptcy Code or under any applicable law (including under sections 502(d), 544, and 547 to 550 of the Bankruptcy Code or under any applicable state Uniform Voidable Transactions Act, Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, or similar statute or common law), or subject to any avoidance, reduction, setoff, recoupment, offset, recharacterization, subordination (whether equitable, contractual, or otherwise), counterclaim, cross-claim, defense, or any other challenge under the Bankruptcy Code or any applicable law or regulation by any person or entity.

5.        **DIP Liens**. In order to secure the DIP Obligations, pursuant to sections 361, 362, 364(c)(2), and 364(c)(3) of the Bankruptcy Code, the DIP Administrative Agent, for the benefit of itself and the DIP Lenders, is granted immediately upon entry of the

Page:    10
Debtors:  Paxe Latitude LP
Case No:  23-11337 (CMG)
Caption:  Order (i) Authorizing Debtor in Possession Financing Pursuant to 11 U.S.C. §§ 105(a),
          362 and 364(c) and (d); (II); Granting Liens And Superpriority Administrative Claims
          Pursuant to 11 U.S.C. § 364(c); (iii) Modifying the Automatic Stay; and (iv) Granting
          Related Relief

---

Order, a continuing, valid, binding, enforceable, non-avoidable, and automatically and properly

perfected postpetition security interests in and liens (collectively, the "***DIP Liens***") on all (i) real

property, and (ii) personal property, whether now existing or hereafter arising and wherever

located, tangible and intangible, of the Debtor (collectively, the "***DIP Collateral***"). The DIP

Collateral shall include the DIP Controlled Account and the DIP Loan Proceeds.  For the

avoidance of doubt, the DIP Liens shall only  be junior to the liens on the collateral (the "***Shared***

***Collateral***") securing obligations under that certain primary loan agreement (the "***Lument Loan***

***Agreement***"; the agent and lenders party thereto from time to time, the "***Lument Secured Parties***")

dated August 16, 2021, between OREC Structured Finance Co., LLC (d/b/a Lument) and the

Debtor.

6.        **DIP Lien Priority**. The DIP Liens securing the DIP Obligations are

valid, automatically perfected, non-avoidable and superior to any security, collateral interest, lien,

or claim to any of the DIP Collateral, and shall otherwise be junior only to (i) the liens on the assets

of the Debtor constituting collateral securing obligations under the Lument Loan Agreement and

(ii) the existing liens disclosed to the DIP Parties on Schedule 2.9 to the DIP Loan Agreement.

Other than as set forth herein or in the DIP Loan Documents, the DIP Liens shall not be made

subject to or *pari passu* with any lien or security interest heretofore or hereinafter granted in the

Case or any Successor Cases, and shall be valid and enforceable against any trustee appointed in

the Case or any Successor Cases, upon the conversion of any of the Case to a case under chapter

7 of the Bankruptcy Code (or in any other Successor Case), and/or upon the dismissal of any of

Page:      11
Debtors:  Paxe Latitude LP
Case No:  23-11337 (CMG)
Caption:  Order (i) Authorizing Debtor in Possession Financing Pursuant to 11 U.S.C. §§ 105(a),
          362 and 364(c) and (d); (II); Granting Liens And Superpriority Administrative Claims
          Pursuant to 11 U.S.C. § 364(c); (iii) Modifying the Automatic Stay; and (iv) Granting
          Related Relief

---

the Case or Successor Cases. The DIP Liens shall not be subject to section 510, 549 or 550 of the

Bankruptcy Code. No lien or interest avoided and preserved for the benefit of the estate pursuant

to section 551 of the Bankruptcy Code shall be *pari passu* with or senior to the DIP Liens.

7.          **DIP Superpriority Claims**. The DIP Administrative Agent, on

behalf of itself and the DIP Lenders, is hereby granted pursuant to section 364(c)(l) of the

Bankruptcy Code, an allowed superpriority administrative expense claim in the Case and any

Successor Cases (collectively, the "***DIP Superpriority Claims***") for all DIP Obligations: having

priority over any and all administrative expense claims and unsecured claims against the Debtor

or its estate in the Case and any Successor Case, at any time existing or arising, of any kind or

nature whatsoever, including administrative expenses under any provision of the Bankruptcy

Code; provided, however, the DIP Superpriority Claims shall be junior to any administrative

expense adequate protection claims of the Lument Secured Parties solely in respect of the  Shared

Collateral.

8.          **Budget Maintenance**.  The use of borrowings under the DIP Facility

shall be in accordance with the Approved Budget, subject in all respects to the permitted variances

set forth in the DIP Loan Agreement.

9.          **Modification of Automatic Stay**. The automatic stay imposed under

section 362(a) of the Bankruptcy Code is hereby modified as necessary to effectuate all of the

terms and provisions of this Order, including to: (a) permit the Debtor to grant the DIP Liens and

DIP Superpriority Claims; (b) permit the Debtor to perform such acts as the DIP Administrative

Page:      12
Debtors:  Paxe Latitude LP
Case No:  23-11337 (CMG)
Caption:  Order (i) Authorizing Debtor in Possession Financing Pursuant to 11 U.S.C. §§ 105(a),
          362 and 364(c) and (d); (II); Granting Liens And Superpriority Administrative Claims
          Pursuant to 11 U.S.C. § 364(c); (iii) Modifying the Automatic Stay; and (iv) Granting
          Related Relief

---

may reasonably request to assure the perfection and priority of the liens granted herein; (c) permit

the Debtor to incur all liabilities and obligations to the DIP Administrative Agent and DIP Lenders

under the DIP Loan Documents, the DIP Facility, and this Order, as applicable; authorize the

Debtor to make, and the DIP Administrative Agent and DIP Lenders to retain and apply, payments

made in accordance with the terms of this Order and the DIP Loan Documents.

10.      **Perfection of DIP Liens**. This Order shall be sufficient and

conclusive evidence of the creation, validity, perfection, and priority of all liens granted under this

Order, including the DIP Liens, without the necessity of filing or recording any financing

statement, fixture filing, notice, or other instrument or document which may otherwise be required

under the law or regulation of any jurisdiction or the taking of any other action to validate or perfect

the DIP Liens, or to evidence or entitle the DIP Administrative Agent, and the DIP Lenders to the

priorities granted herein.

11.      **DIP Maturity Date**. The commitment of the DIP Lenders shall

terminate and all amounts owing under the DIP Facility shall be due and payable on the earliest of

(i) the Stated Maturity Date or the Extended Stated Maturity Date (as applicable (each as such term

is defined in the DIP Loan Agreement), (ii) the consummation of any sale of all or substantially

all of the assets of the Debtor pursuant to Section 363 of the Bankruptcy Code, (iii) the acceleration

of the DIP Loans and the termination of the DIP Commitments upon the delivery of a Termination

Declaration (as defined below), (iv) the effective date of any plan of reorganization, and (v) within

Page:      13
Debtors:   Paxe Latitude LP
Case No:   23-11337 (CMG)
Caption:   Order (i) Authorizing Debtor in Possession Financing Pursuant to 11 U.S.C. §§ 105(a), 362 and 364(c) and (d); (II); Granting Liens And Superpriority Administrative Claims Pursuant to 11 U.S.C. § 364(c); (iii) Modifying the Automatic Stay; and (iv) Granting Related Relief

---

two business days of the receipt by the Borrower of the net proceeds of the Insurance Settlement (as defined in the DIP Loan Agreement).

12.      **No Obligation to Extend Credit**. The DIP Administrative Agent and DIP Lenders shall have no obligation to make any loan under the DIP Loan Documents, unless all of the conditions precedent to the making of such extensions of credit under the DIP Loan Documents and this Order have been satisfied in full or waived by the DIP Administrative Agent and DIP Lenders, as applicable, and in accordance with the terms of the DIP Loan Agreement).

13.      **Events of Default**. The occurrence of any of the following events, unless waived by the DIP Administrative Agent in writing and in accordance with the terms of the DIP Loan Agreement, shall constitute an event of default (an "***Event of Default***"): (a) the failure of the Debtor to perform, in any respect, any of the terms, provisions, covenants or obligations under this Order, (b) the failure of the Debtor to comply with the Approved Budget on the terms and subject to the permitted variances set forth in the DIP Loan Documents; or (c) the occurrence of any other "Event of Default" under the DIP Loan Documents.

14.      **Rights and Remedies Upon Event of Default**. Immediately upon the occurrence and during the continuation of an Event of Default, notwithstanding the provisions of section 362 of the Bankruptcy Code, without any application, motion or notice to, hearing before, or order from the Court, but subject to the terms of this Order the DIP Administrative Agent may declare (any such declaration shall be referred to herein as a "***Termination Declaration***") (a) all DIP Obligations owing under the respective DIP Loan Documents to be immediately due and

Page:     14
Debtors:  Paxe Latitude LP
Case No:  23-11337 (CMG)
Caption:  Order (i) Authorizing Debtor in Possession Financing Pursuant to 11 U.S.C. §§ 105(a),
          362 and 364(c) and (d); (II); Granting Liens And Superpriority Administrative Claims
          Pursuant to 11 U.S.C. § 364(c); (iii) Modifying the Automatic Stay; and (iv) Granting
          Related Relief

---

payable, (b) the termination, reduction or restriction of any further commitment to extend credit to

the Debtor under the DIP Facility, (c) termination of the DIP Facility and the DIP Loan Documents

as to any future liability or obligation of the DIP Administrative Agent and the DIP Lenders, but

without affecting any of the DIP Liens or the DIP Obligations, and (d) a termination, reduction or

restriction on the ability of the Debtor to use cash constituting DIP Collateral.  The Termination

Declaration shall include notice of the occurrence of the Event of Default and shall be given by

electronic mail to counsel to the Debtor, counsel for the Lument Secured Parties, and the U.S.

Trustee. The automatic stay in the Cases otherwise applicable to the DIP Administrative Agent

and the DIP Lenders is hereby modified so that five (5) business days after the date a Termination

Declaration is delivered (the "***Remedies Notice Period***"), the DIP Administrative Agent and the

DIP Lenders shall be entitled to exercise their rights and remedies in accordance with the DIP

Loan Documents and this Order to satisfy the DIP Obligations, DIP Superpriority Claim, and DIP

Liens.  During the Remedies Notice Period, the Debtor shall be entitled to seek an emergency

hearing within the Remedies Notice Period. Unless the Court orders otherwise (whether during the

Remedies Notice Period or within five (5) business days of the expiration thereof), the automatic

stay, as to DIP Administrative Agent and the DIP Lenders shall automatically be terminated at the

end of the Remedies Notice Period without further notice or order. Upon expiration of the

Remedies Notice Period or within five (5) business days of the expiration thereof, the DIP

Administrative Agent and the DIP Lenders, the Lument Secured Parties shall be permitted to

exercise all remedies set forth herein and in the DIP Loan Documents as applicable, and as

Page:    15
Debtors: Paxe Latitude LP
Case No: 23-11337 (CMG)
Caption: Order (i) Authorizing Debtor in Possession Financing Pursuant to 11 U.S.C. §§ 105(a),
362 and 364(c) and (d); (II); Granting Liens And Superpriority Administrative Claims
Pursuant to 11 U.S.C. § 364(c); (iii) Modifying the Automatic Stay; and (iv) Granting
Related Relief

---

otherwise available at law without further order of or application or motion to the Court, subject

paragraph 15 (Application of Proceeds of Collateral).

15.      **Application of Proceeds of Collateral**.  The Debtors shall apply all

net proceeds of DIP Collateral in accordance with the DIP Loan Documents until the DIP

Obligations have been indefeasibly paid in full in cash; provided, however, no proceeds from

Shared Collateral shall be applied via payment from the Debtor or exercise of remedies by the DIP

Agent to satisfy the DIP Obligations until the Lument Obligations are fully discharged.  All

proceeds of DIP Collateral that are not otherwise required to be applied to repay the Lument

Obligations or the DIP Obligations shall be held in the DIP Controlled Account.

16.      **Good Faith Under Section 364(e) of the Bankruptcy Code**. The

DIP Administrative Agent and the DIP Lenders have acted in good faith in connection with this

Order and are entitled to rely upon the protections granted herein and by section 364(e) of the

Bankruptcy Code.  Based on the findings set forth in this Order and the record made during the

hearing on the DIP Motion, and in accordance with section 364(e) of the Bankruptcy Code, in the

event any or all of this Order are hereafter reargued, reconsidered, reversed, modified, amended,

or vacated by a subsequent order of this Court or any other court, the DIP Administrative Agent

and the DIP Lenders are entitled to the protections provided in section 364(e) of the Bankruptcy

Code to the maximum extent set forth therein.

Page:     16
Debtors:  Paxe Latitude LP
Case No:  23-11337 (CMG)
Caption:  Order (i) Authorizing Debtor in Possession Financing Pursuant to 11 U.S.C. §§ 105(a),
          362 and 364(c) and (d); (II); Granting Liens And Superpriority Administrative Claims
          Pursuant to 11 U.S.C. § 364(c); (iii) Modifying the Automatic Stay; and (iv) Granting
          Related Relief

---

17.         **No Third-Party Rights**. Except as explicitly provided for herein,

this Order does not create any rights for the benefit of any third party, creditor, equity holder or

any direct, indirect, or incidental beneficiary.

18.         **Insurance Proceeds and Policies**. The DIP Administrative Agent

(on behalf of the DIP Lenders) shall be named as additional insured and loss payee on each

insurance policy maintained by the Debtor that in any way relates to the DIP Collateral or proceeds

thereof.

19.         **Release of DIP Administrative Agent and DIP Lenders**. The

Debtor, forever and irrevocably, to the maximum extent permitted by applicable law: (i) releases,

discharges, and acquits each of, (a) effective upon entry of this Order, the DIP Administrative

Agent and DIP Lenders, and in each case, each of their former or current officers, employees,

directors, agents, representatives, owners, members, partners, financial advisors, legal advisors,

shareholders, managers, consultants, accountants, attorneys, affiliates, and predecessors-in-

interest of and from any and all claims, demands, liabilities, responsibilities, disputes, remedies,

causes of action, indebtedness and obligations, of every type, including, without limitation, any

so-called "lender liability" or equitable subordination claims or defenses, solely with respect to or

relating to the negotiation and entry into the DIP Loan Documents and the use of cash constituting

DIP Collateral; and (ii) waive, discharge and release any and all defenses (including, without

limitation, offsets and counterclaims of any nature or kind) as to the validity, perfection, priority,

enforceability, and avoidability of the DIP Obligations; *provided* that nothing in this paragraph

Page:     17
Debtors:  Paxe Latitude LP
Case No:  23-11337 (CMG)
Caption:  Order (i) Authorizing Debtor in Possession Financing Pursuant to 11 U.S.C. §§ 105(a),
          362 and 364(c) and (d); (II); Granting Liens And Superpriority Administrative Claims
          Pursuant to 11 U.S.C. § 364(c); (iii) Modifying the Automatic Stay; and (iv) Granting
          Related Relief

---

shall in any way limit or release the obligations of the DIP Lenders under the DIP Loan Documents

and this Order.

20.        **Amendment**.  Subject to the terms and conditions of the DIP Loan

Agreement and the other DIP Loan Documents, Borrower, DIP Agent and DIP Lenders may

amend, modify, supplement or waive any provision of the DIP Loan Documents (a "***DIP Loan***

***Amendment***") without further approval or order of the Court, so long as (a) such DIP Loan

Amendment is not material (for purposes hereof, a "material" DIP Loan Amendment shall mean

any DIP Loan Amendment that operates to increase or change in any manner adverse to the

Borrower the economic terms of the DIP Loan Agreement, (b) the Debtor provides prior written

notice of the DIP Loan Agreement (the "***DIP Loan Amendment Notice***") to counsel for the

Lument Secured Parties and the U.S. Trustee and (c) no objection to the DIP Loan Amendment is

filed with the Court within five (5) business days from the date the DIP Loan Amendment Notice

is filed with the Court in accordance with this Paragraph.  Any material DIP Loan Amendment to

the DIP Loan Documents must be approved by the Court to be effective.  Notwithstanding the

foregoing, any immaterial amendments that are made to the proposed final form of DIP Loan

Agreement attached as Exhibit A to the Commitment Letter shall be filed with the Court within at

least two (2) business days from the closing date of the DIP Loan Agreement.

21.        **Survival**.  The provisions of this Order and any actions taken

pursuant hereto shall survive entry of any order which may be entered converting the Case to a

case under chapter 7 of the Bankruptcy Code or dismissing the Case or any Successor Case.  The

Page:      18
Debtors:   Paxe Latitude LP
Case No:   23-11337 (CMG)
Caption:   Order (i) Authorizing Debtor in Possession Financing Pursuant to 11 U.S.C. §§ 105(a),
           362 and 364(c) and (d); (II); Granting Liens And Superpriority Administrative Claims
           Pursuant to 11 U.S.C. § 364(c); (iii) Modifying the Automatic Stay; and (iv) Granting
           Related Relief

---

terms and provisions of this Order, including the claims, liens, security interests, and other

protections granted to the DIP Administrative Agent and the DIP Lenders shall continue in the

Case, in any Successor Case, or following dismissal of the Case or any Successor Case, and shall

maintain their validity, enforceability and priority as provided by this Order until all the DIP

Obligations, pursuant to the DIP Loan Documents and this Order, have been indefeasibly paid in

full in cash, and all commitments to extend credit under the DIP Facility are terminated.

      22.      **<u>Retention of Jurisdiction</u>**. The Court has and will retain jurisdiction

to enforce the terms of any and all matters arising from or related to the DIP Facility, and/or this

Order.

.

**SCHEDULE 1**

**Approved Budget**

[to be Provided]